ORDERED.

**Dated:  March 25, 2021**

Karen S. Jennemann
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

In re:

UNIVERSAL TOWERS CONSTRUCTION,
INC.,

CASE NO. 6:20-bk-03799-KSJ
Chapter 11

        Debtor.

_____/

**ORDER (I) AUTHORIZING THE SALE OF THE HOTEL PROPERTY FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS; (II) AUTHORIZING AND APPROVING THE PURCHASE AND SALE AGREEMENTS; (III) APPROVING ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (IV) GRANTING RELATED RELIEF**

THIS MATTER came before the Court in Orlando, Florida on March 17, 2021 at 2:00 p.m.

(the "Sale Hearing") in the above-styled chapter 11 case (the "Bankruptcy Case") upon (i) the

*Debtor's Expedited Motion for Entry of an Order (1) Approving Bidding Procedures for the Sale*

*of the Debtor's Hotel Property, (2) Scheduling a Final Sale Hearing, (3) Approving the Form and*

*Manner of Notices, (4) Approving the Sale of the Debtor's Hotel Property Free and Clear of all*

*Liens, Claims, and Encumbrances and Interests, (5) Approving Assumption and Assignment*

*Procedures, and (6) Granting Related Relief* (Doc. No. 197), dated November 25, 2020 (the "Sale

Motion")[1] filed by Universal Towers Construction, Inc. (the "Debtor"), and (ii) that certain *Order (1) Approving Bidding Procedures for the Sale of Debtor's Hotel Property, (2) Scheduling Dates to Conduct Auction and Sale Hearing, (3) Approving the Form and Manner of Notices, (4) Approving the Sale of the Hotel Property Free and Clear of All Liens, Claims, Encumbrances and Interests, (5) Approving Assumption and Assignment Procedures, and (6) Granting Related Relief* (Doc. No. 208), dated December 9, 2020 (the "Bid Procedures Order"), pursuant to which the Debtor requested, *inter alia*, entry of an order (the "Sale Order") pursuant to sections 105(a), 363, 365, and 1146 of the Bankruptcy Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rules 2002-1 and 6004-1 of the Local Rules of the United States Bankruptcy Court for the Middle District of Florida (the "Local Rules") (a) approving the sale (the "Sale") of Debtor's hotel real property, improvements, and personal property located at 7800 Universal Blvd., Orlando, Florida 32819 (collectively, the "Hotel Property"), free and clear of all liens, claims, encumbrances and other interests to the maximum extent permitted by section 363(f) of the Bankruptcy Code, other than the Permitted Exceptions (as defined in the Agreement (as defined below)), with such sale to be consummated in accordance with the terms and conditions of the Agreement; (b) authorizing and approving the execution and delivery of the Agreement; (c) approving the Debtor's assumption and assignment of certain executory contracts and unexpired leases; and (d) granting related relief, all as more fully described in the Sale Motion and set forth herein.

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Sale Motion or the Bid Procedures Order (as defined below), as applicable.

At the auction conducted by the Debtor on March 16, 2021 (the "<u>Auction</u>"), in accordance with the Bid Procedures Order, the Debtor determined that the highest or otherwise best offer received for the Hotel Property was a bid made by MAC New Opportunities LLC (the "<u>Purchaser</u>") as set forth in that certain *Purchase and Sale Agreement* among the Purchaser, on the one hand, and the Debtor, as seller (the "<u>Seller</u>"), on the other hand, dated as of March 16, 2021, together with the exhibits and schedules thereto (the "<u>Agreement</u>"), a copy of which was filed by the Debtor under a Notice of Filing, dated March 17, 2021 (Doc. No. 293) and is attached as **<u>Exhibit A</u>** hereto.  Debtor further determined that the next highest or otherwise best offer received for the Hotel Property was a bid made by 7800 Universal Blvd Owner, LLC (the "<u>Back-Up Purchaser</u>"; and together with Purchaser, the "<u>Purchasers</u>") as set forth in that certain *Purchase and Sale Agreement* among the Back-Up Purchaser, on the one hand, and the Debtor, as Seller, on the other hand, dated as of March 18, 2021, together with the exhibits and schedules thereto (the "<u>Back-Up Agreement</u>"; and together with the Agreement, the "<u>Agreements</u>"), an unexecuted copy of which was filed by the Debtor under a Notice of Filing, dated March 17, 2021 (Doc. No. 294) and is attached as **<u>Exhibit B</u>** hereto.

The Court (I) has considered: (a) the Sale Motion and any objections thereto, including, without limitation, those filed at Doc. Nos. 278 and 279, (b) the proposed sale of the Hotel Property by the Debtor to the Purchaser or the Back-Up Purchaser pursuant to the respective Agreements and the transactions contemplated thereby (the "<u>Transactions</u>"), (c) the evidence proffered by the Debtor and accepted into evidence at the Sale Hearing, including specifically the testimony of Lis Oliveira-Sommerville as President of the Debtor, and Lamar Fisher on behalf of Auctioneer, and the Auction Summary Package prepared by Auctioneer, filed at Doc. No. 292-1 and accepted into evidence as Exhibit 1, as set forth on the record at the Sale Hearing, (d) the full record in this

Bankruptcy Case, including the record related to the hearing to consider the Bid Procedures Order and the Sale Hearing held before the Court, and (e) the arguments and positions of all parties in interest regarding the approval of the Agreements, the Sale, and the Transactions contemplated by the Agreements, and (II) finds that (a) the relief requested in the Sale Motion is in the best interests of the Debtor, its estate, its creditors and all other parties in interest, (b) reasonable and adequate notice of the Sale Motion, the Bid Procedures Order, the Transactions contemplated by the Agreements, the Auction, the relief requested in this Sale Order, and the Sale Hearing has been provided to all persons required to receive such notice in accordance with the Bankruptcy Code and the Bankruptcy Rules, and after due deliberation thereon and with good and sufficient cause appearing therefor:

THE COURT FURTHER FINDS AND DETERMINES THAT:

**Jurisdiction, Final Order, and Statutory Predicates**

A.      The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent that any of the following conclusions of law constitute findings of fact, they are adopted as such.

B.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.

C.      This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). The Debtor and the Purchasers have confirmed their consent to the entry of a final order by this Court in connection with the Sale Motion, to the extent that it is later determined that the Court, absent the consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

D.      Venue of the Bankruptcy Case is proper in this District pursuant to 28 U.S.C. § 1408.

E.      The bases for the relief requested in the Sale Motion are sections 105(a), 363, 365, and 1146 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006(a), and 9014, and Local Rules 2002-1 and 6004-1.

F.      This Sale Order constitutes a final order within the meaning of 28 U.S.C. § 158(a). Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, the Court expressly finds that there is no just reason for delay in the implementation of this Sale Order and waives any stay and expressly directs entry of judgment as set forth herein.

### Retention of Jurisdiction

G.      It is necessary and appropriate for the Court to retain jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Sale Order and the Agreements, including, without limitation, the related documents attached to the Agreements as exhibits, all amendments thereto, and any waivers and consents thereunder and each of the agreements executed in connection therewith to which the Debtor is a party or which has been assigned by the Debtor to Purchaser or Back-Up Purchaser, as the case may be, and to adjudicate, if necessary, any and all disputes involving the Debtor concerning or relating in any way to, or affecting, the Sale or the Transactions and related documents.

### Corporate Authority; Consents and Approvals

H.      The Debtor has, to the extent necessary or applicable, (a) the full corporate power and authority to execute and deliver the Agreements and all other documents contemplated thereby, (b) all corporate authority necessary to consummate the Transactions, and (c) taken all

corporate action necessary to authorize and approve the Agreements and the consummation of the Transactions, which have been duly and validly authorized. No consents or approvals, other than those expressly provided for in the Agreements, are required for the Debtor to consummate the Sale, the Agreements, or the Transactions.

### Notice of Sale, Auction, and Assumption and Assignment

I.      Actual written notice of the Auction and the Cure Notice (Doc. No. 260), was served (as applicable) upon: (a) the Office of the United States Trustee; (b) all creditors or their counsel known to the Debtor to assert a lien (including any security interest), claim, right, interest, or other encumbrance of record against all or any portion of the Hotel Property; (c) all applicable federal, state, and local taxing and regulatory authorities of the Debtor or recording offices or any other governmental authorities that, as a result of the Sale, may have claims, contingent or otherwise, in connection with the Debtor's ownership of the Hotel Property or have any known interest in the relief requested by the Sale Motion; (d) the United States Attorney's office for the Middle District of Florida; (e) all parties in interest who have requested notice pursuant to Bankruptcy Rule 2002 as of the date of the Sale Motion; (f) all parties to any litigation involving the Debtor; (g) all counterparties to any executory contract or unexpired lease of the Debtor; (h) all other known creditors and interest holders of the Debtor; and (i) all potential bidders, previously identified or otherwise known to the Debtor (collectively, the "Notice Parties"). *See* Doc. Nos. 242, 243, 260.  In addition, Fisher Auction Company (the "Auctioneer") and the co-broker, HREC Investment Advisors ("HREC"), advertised the Sale through print media, including the Wall Street Journal, the Orlando Business Journal, the South Florida Business Journal, and daily ads in the Daily Business Review; over the internet on Loopnet.com, Real Capital Markets, CREXi, on Auctioneer's website; on certain social media platforms such as Facebook, Twitter, and Instagram;

and via email blasts to all appropriate addresses available through the Auctioneer's and HREC's email databases.

J. In accordance with the provisions of the Bid Procedures Order, the Debtor has served notice (Doc. No. 260) upon the counterparties (the "Contract Counterparties") to each Assigned Contract (as defined below) of the following: (a) that the Debtor intends to assume and assign to Purchaser or Back-Up Purchaser the Assigned Contracts on the Closing Date (as defined in the Agreements); and (b) the relevant Cure Amount associated therewith (as defined in the Cure Notice). Service of such notice was good, sufficient, and appropriate under the circumstances, and no further notice need be given in respect of establishing a Cure Amount for the Assigned Contracts.

K. The Notice of Auction and Sale Hearing (Doc. No. 242) was served on all parties required to receive such notice under the Bid Procedures Order and applicable rules.  Such notice was appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the Sale, the Auction, and the Sale Hearing.

L. Notice of the Sale Motion, the Sale, the Auction, the Sale Hearing, and the Transactions, including, without limitation, the assumption and assignment of the Assigned Contracts to Purchaser or Back-Up Purchaser, as the case may be, has been provided in accordance with the Bid Procedures Order and all applicable rules. The notices described herein were good, sufficient, and appropriate under the circumstances, and no other or further notice of the Sale Motion, the Sale, the Auction, the Sale Hearing, or the Transactions is or shall be required.

M. The disclosures made by the Debtor concerning the Sale Motion, the Agreements, the Auction, the Sale Hearing, the Sale, and the Transactions were good, complete, and adequate.

N.    A reasonable opportunity to object and be heard with respect to the Sale and the Sale Motion, and the relief requested therein (including, without limitation, the assumption and assignment of the Assigned Contracts to Purchaser or Back-Up Purchaser, as the case may be, and any Cure Amount relating thereto), has been afforded to all interested persons and entities, including the Notice Parties.

## Auction

O.    At the conclusion of the Auction held on March 16, 2021, the Debtor determined, in a valid and sound exercise of its business judgement and in accordance with the Bid Procedures, that the highest or otherwise best bid for the Hotel Property was that of the Purchaser.  The Auction afforded a full, fair, and reasonable opportunity for any person or entity to make a higher or otherwise better offer from that of the Stalking Horse Bidder to purchase the Hotel Property.

## Good Faith of Purchaser

P.    As demonstrated by the record before the Court, the representations of counsel, and other evidence proffered or adduced at the Sale Hearing and all prior hearings before the Court, the Debtor and its advisors marketed the Hotel Property to secure the highest or otherwise best offer. The terms and conditions set forth in the Agreements are fair, adequate, and reasonable, including the amount and form of the Purchase Price (as defined in the Agreements), which is found to constitute reasonably equivalent and fair value.

Q.    Neither of the Purchasers is an "insider" of the Debtor, as that term is defined in Bankruptcy Code section 101(31). No officer, director, manager, or other insider of the Debtor holds any interest in or is otherwise related to either of the Purchasers.

R.    The Debtor and Purchasers negotiated the terms and conditions of, and entered into, the Agreements at arm's length, without collusion or fraud, and in good faith.  Additionally, (i) Purchasers recognized that the Debtor was free to deal with any other party interested in

purchasing the Hotel Property; (ii) Purchasers agreed to subject their respective bids to competitive bidding at the Auction; (iii) all agreements or arrangements entered into by Purchasers in connection with the Sale have been disclosed; (iv) Purchasers have not violated Bankruptcy Code section 363(n) by any action or inaction; and (v) no common identity of directors or controlling stockholders exists between either of the Purchasers and the Debtor. The negotiation and execution of the Agreements was at arm's length and in good faith.

S.    Neither the Debtor nor either of the Purchasers has engaged in any conduct that would cause or permit the Agreements to be avoided under Bankruptcy Code section 363(n). The Debtor, Purchaser, and Back-Up Purchaser were each represented by their own respective counsel and other advisors during such arm's length negotiations in connection with the Agreements and the Sale.

T.    No party has objected to the Sale, the Agreements, or the Auction on the grounds of fraud or collusion.

U.    Purchaser or, as applicable, Back-Up Purchaser, is purchasing the Hotel Property in good faith and each is a good-faith buyer within the meaning of Bankruptcy Code section 363(m). Purchasers are both therefore entitled to all of the protections afforded under Bankruptcy Code section 363(m), including in the event this Sale Order or any portion thereof is revised or modified on appeal.

### Highest or Best Offer

V.    The Debtor conducted a sale process in accordance with, and has otherwise complied in all respects with, the Bid Procedures Order. The sale process set forth in the Bid Procedures Order afforded a full, fair, and reasonable opportunity for any person or entity to make an offer to purchase the Hotel Property.

W.      The Agreement constitutes the highest or otherwise best offer for the Hotel Property, and will provide greater overall value for the Debtor's estate than would be provided by any other available alternative. The Debtor's determination that the Agreement constitutes the highest or otherwise best offer for the Hotel Property constitutes a valid and sound exercise of the Debtor's business judgment and entry into and consummation of the Agreement is in the best interests of the Debtor, its estate, and all parties in interest.

X.      The Back-Up Agreement constitutes the next highest or otherwise best offer for the Hotel Property, and will provide greater overall value for the Debtor's estate than would be provided by any other available alternative. The Debtor's determination that the Back-Up Agreement constitutes the next highest or otherwise best offer for the Hotel Property constitutes a valid and sound exercise of the Debtor's business judgment and entry into and consummation of the Back-Up Agreement, if necessary, is in the best interests of the Debtor, its estate, and all parties in interest.

Y.      The Agreements each represent a fair market value for the Hotel Property under the circumstances of this Bankruptcy Case. No other entity or group of entities has offered to purchase the Hotel Property for greater overall value to the Debtor's estate than Purchasers, respectively.

Z.      The Debtor has demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the Sale pursuant to the terms and conditions set forth in the Agreements and in connection with and under the Debtor's *First Amended Plan of Liquidation* (Doc. No. 239) (the "Plan").

### No Fraudulent Transfer or Merger

AA.     The consideration (including the amount and form thereof) provided by Purchasers pursuant to the Agreements (a) is fair and reasonable and (b) constitutes reasonably equivalent value (as that term is defined in each of the Uniform Fraudulent Transfer Act, the Uniform

Voidable Transactions Act, and section 548 of the Bankruptcy Code) and fair consideration (as that term is defined in the Uniform Fraudulent Conveyance Act) and the Transactions may not be avoided under section 363(n) of the Bankruptcy Code or any other applicable law.

BB.    Purchaser is not a mere continuation of the Debtor or its estate, and there is no continuity of enterprise between Purchaser and the Debtor. Purchaser is not holding itself out to the public as a continuation of the Debtor. Purchaser is not a successor to the Debtor or its estates, and the Sale does not amount to a consolidation, merger, or *de facto* merger of Purchaser and the Debtor.

### Validity of Transfer

CC.    The Agreements were not entered into for the purpose of hindering, delaying, or defrauding creditors of the Debtor under the Bankruptcy Code or under the laws of the United States, any of its states, territories, or possessions, or the District of Columbia or any other applicable law. Neither the Debtor nor Purchasers are entering into the transactions contemplated by the Agreements with any fraudulent or otherwise improper purpose.

DD.    The Debtor is the sole and lawful owner of the Hotel Property.  Except as provided in the Agreements and herein, the transfer of the Hotel Property to Purchaser will, as of the Closing Date, vest Purchaser with all right, title, and interest of the Debtor in and to the Hotel Property free and clear of any lien, claim, encumbrance, or other interest in such property of any entity (collectively, "Interests"), including, without limitation: (a) all liens, including liens and encumbrances relating to, accruing, or arising at any time prior to the Closing Date (collectively, the "Liens"); (b) all obligations arising under any government programs, including, without limitation, the Paycheck Protection Program and any other programs under the Coronavirus Aid, Relief, and Economic Security Act; and (c) all claims (as defined in section 101 of the Bankruptcy Code) and liabilities, including deposits owed on the Hotel Property, obligations, demands,

guarantees, options in favor of third parties, rights, contractual commitments, restrictions, interests, and matters of any kind and nature, whether arising prior to or subsequent to the commencement of the Bankruptcy Case, and whether imposed by agreement, understanding, law, equity, or otherwise (collectively, the "Claims"), and all such Interests will attach to the proceeds of the Sale received by the Debtor ultimately attributable to the Hotel Property, in the same order of priority, with the same validity, force, and effect that such Interests had prior to the Sale (subject to any claims and defenses the Debtor and its estate may possess with respect thereto).

EE.    For the avoidance of doubt, the terms "Interests," "Liens" and "Claims," as used in this Sale Order, include, without limitation, rights with respect to any Interests, Liens and Claims:

    a.    that purport to give any party a right of setoff or recoupment against, or a right or option to affect any forfeiture, modification, profit-sharing interest, right of first refusal, purchase or repurchase writer option, or termination of, the Debtor's or Purchaser's interest in the Hotel Property, or any similar rights; or

    b.    in respect of taxes, restrictions, rights of first refusal, charges of interest of any kind and nature, if any, and including, without limitation, any restriction of use, voting, transfer, receipt of income, or other exercise of any of the attributes of ownership relating to, accruing, or arising at any time prior to the Closing Date, with the exception of Permitted Exceptions that are expressly assumed by Purchaser or, if applicable, the Back-Up Purchaser, pursuant to the Agreement or the Back-Up Agreement, as the case may be.

FF.    For the further avoidance of doubt, and notwithstanding anything herein to the contrary, Purchasers are expressly assuming responsibility for, and the Hotel Property will be

transferred subject to, (i) the Cure Amounts, (ii) any Permitted Exception, and (iii) any obligations arising at or after the Closing Date under the Agreements and the Assigned Contracts, as set forth in the Agreements.

**Sale Free and Clear Under Section 363(f) Is Satisfied**

GG.    The conditions of Bankruptcy Code section 363(f) have been satisfied in full. Therefore, subject to the other provisions of this Sale Order, the Debtor may sell the Hotel Property pursuant to the Agreements free and clear of any Interests in such Hotel Property, other than any Permitted Exceptions, with all such Interests attaching to the proceeds of the Sale received by the Debtor, in the same order of priority, with the same validity, force, and effect that such Interests had prior to the Sale in the Hotel Property (subject to any claims and defenses the Debtor and its estate may possess with respect thereto).

HH.    Purchasers would not have entered into the Agreements, respectively, and would not consummate the Transactions, if the Sale of the Hotel Property to Purchasers was not free and clear of all Interests, other than Permitted Exceptions, or if Purchasers would, or in the future could, be liable for any of such Interests (other than the Permitted Exceptions). Unless otherwise expressly included in the Permitted Exceptions, Purchasers shall not be responsible for any Interests against the Debtor, its estate, or any of the Hotel Property, including in respect of the following: (a) any deposits made by creditors or third parties; (b) any labor or employment agreement; (c) all mortgages, deeds of trust, and other security interests; (d) any Interest held by the Debtor's equity holders; and (e) any other environmental, employee, workers' compensation, occupational disease, or unemployment- or temporary disability-related claim, including, without limitation, claims that might otherwise arise under or pursuant to (i) the Employee Retirement Income Security Act of 1974, as amended, (ii) the Fair Labor Standards Act, (iii) Title VII of the Civil Rights Act of 1964, (iv) the Federal Rehabilitation Act of 1973, (v) the National Labor

Relations Act, (vi) the Worker Adjustment and Retraining Notification Act of 1988, (vii) the Age Discrimination and Employee Act of 1967 and the Age Discrimination in Employment Act, as amended, (viii) the Americans with Disabilities Act of 1990, (ix) the Consolidated Omnibus Budget Reconciliation Act of 1985, (x) state discrimination laws, (xi) the unemployment compensation laws or any other similar state or local laws, (xii) any other state, local, or federal benefits or claims relating to any employment with the Debtor or its predecessor, if any, (xiii) Claims or Liens arising under any environmental law with respect to the Debtor's business, the Hotel Property, or any assets owned or operated by the Debtor or any corporate predecessor of the Debtor, at any time prior to the Closing Date, (xiv) any bulk sales or similar law, (xv) any tax statutes or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended, (xvi) any antitrust laws, (xvii) any statutory or common-law bases for successor liability.

II.       The Debtor may sell the Hotel Property pursuant to the Agreements free and clear of all Interests in such property of any entity other than the Debtor's estate, (other than the Permitted Exceptions) because, in each case, one or more of the standards set forth in Bankruptcy Code section 363(f)(1)-(5) has been satisfied. Holders of Interests in the Hotel Property prior to the Closing Date, including, without limitation, holders of Liens and Claims against the Debtor, its estate, or any of the Hotel Property, either consented to, or are deemed to consent to, the Sale because such holders did not object, or withdrew their objections, to the Sale or the Sale Motion. All other holders of Interests (except to the extent that such Interests are Permitted Exceptions) could be compelled in a legal or equitable proceeding to accept monetary satisfaction of its Interest and are adequately protected by having their Interests, if any, in each instance against the Debtor, its estate, or any of the Hotel Property, attached to the proceeds of the Sale received by the Debtor ultimately attributable to the specific Hotel Property in which such party alleges an Interest, in the

same order of priority, with the same validity, force, and effect that such Interests had prior to the Sale, subject to any claims and defenses the Debtor and its estate may possess with respect thereto.

### Assumption and Assignment of the Assigned Contracts

JJ.     Pursuant to the Agreements, the Purchasers seek to have the Debtor assume and assign to it those certain executory contracts and unexpired leases (the "Assigned Contracts") identified in the Notice of Debtor's Intent to Assume and Assign Certain Unexpired Leases and Executory Contacts and Setting Forth Cure Amounts (Doc. No. 260) (the "Cure Notice"), which such list may be modified prior to the effective date of the Plan to remove any Assigned Contract or to add Additional Contracts (as defined below).  The Cure Amount associated with the Assigned Contracts are set forth opposite each such Assigned Contract on Schedule 1 to the Cure Notice, except with respect to the Cure Amount for the executory contract with KONE, Inc., which the Debtor and KONE, Inc. agree shall be $341.59.  To the extent any Assigned Contract is not an executory contract within the meaning of section 365 of the Bankruptcy Code, it shall be transferred to the Purchaser or Back-Up Purchaser, as the case may be, in accordance with the terms of the Agreement.

KK.     The assumption and assignment of the Assigned Contracts, as may be modified pursuant to the terms of this Sale Order and the Agreements, is integral to the Sale and is in the best interest of the Debtor and its estate, its creditors, and all of the parties in interest, and represents the reasonable exercise of sound and prudent business judgment by the Debtor.

LL.     The Purchasers have demonstrated adequate assurance of future performance with respect to the Assigned Contracts pursuant to section 365(b)(1)(C) of the Bankruptcy Code that are being assumed and assigned to the Purchaser or the Back-Up Purchaser, as the case may be, pursuant to the terms of the Agreements. Except as provided in the Agreements, the Assigned Contracts are assignable notwithstanding any provisions contained therein to the contrary.

MM.    Pursuant to the terms of the Agreements, Purchaser or Back-Up Purchaser, as the case may be, shall pay the Cure Amounts related to the Assigned Contracts and such payment shall constitute (a) the cure of any default existing prior to the Closing Date with respect to the Assigned Contracts, within the meaning of Bankruptcy Code sections 365(b)(1)(A) and 365(f)(2)(A) and (b) compensation or adequate assurance of compensation to any Contract Counterparty for any actual pecuniary loss to such party resulting from a default prior to the date hereof with respect to the Assigned Contracts, within the meaning of Bankruptcy Code sections 365(b)(1)(B) and 365(f)(2)(A). The Court finds that such payment of Cure Amounts is reasonable and appropriate and is deemed to fully satisfy the Debtor's obligations under section 365(b) and 365(f) of the Bankruptcy Code.

NN.    If and to the extent the Purchaser or Back-Up Purchaser elects to seek to have the Debtor assume and assign to it any executory contracts or unexpired leases other than the Assigned Contracts (the "Additional Contracts"), then the Purchaser or Back-Up Purchaser shall provide notice, and file a copy of such notice with this Court, to any such Additional Contract counterparty of such Purchaser's intent to assume and assign such Additional Contracts, which notice shall include the proposed Cure Amount related to such Additional Contract. In the event a counterparty objects to the Purchaser's assumption and assignment of an Additional Contract, then the Purchaser and the Debtor shall seek relief from the Court on or before the effective date of the Plan. The Court will conduct a preliminary hearing with respect to the Additional Contracts, if necessary, at the Further Hearing (as defined below).

OO.    For avoidance of doubt and other than with respect to the Cure Amounts associated with the Assigned Contracts, the proposed Cure Amounts set forth in the Debtor's Cure Notice, as modified herein, shall be without prejudice to any counterparty thereto asserting any claims against

the Debtor's estate, including rejection damage claims, and shall not be binding on any counterparty thereto or any other party for any other purpose in the Chapter 11 Case or otherwise. Furthermore, the failure of any party to object to the proposed Cure Amounts for contracts that are not Assigned Contracts shall not be deemed a waiver of any rights or claims that such party may otherwise be entitled to or entitled to assert under any contract or under applicable bankruptcy or non-bankruptcy law.

## Sound Business Purpose for the Sale

PP.    Good and sufficient reasons for approval of the Agreements and the Sale have been articulated by the Debtor. The Debtor has demonstrated both (a) good, sufficient, and sound business purposes and justifications for approving the Agreements, and (b) compelling circumstances for the Sale outside the ordinary course of business, pursuant to Bankruptcy Code sections 363(b) and 1146, in that, among other things, the immediate consummation of the Sale to Purchaser or Back-Up Purchaser, as the case may be, is necessary and appropriate to maximize the value of the Debtor's estate, and the Sale will provide the means for the Debtor to maximize distributions to creditors.

## Compelling Circumstances for an Immediate Sale

QQ.    To maximize the value of the Hotel Property and preserve the viability of the business to which the Hotel Property relates, it is essential that the Sale of the Hotel Property occur within the time constraints set forth in the Agreements. Time is of the essence in consummating the Sale.

RR.    The Sale does not constitute a *sub rosa* or *de facto* chapter 11 plan for which approval has not been sought without the protections that a disclosure statement would afford, as it does not and does not propose to (i) impair or restructure existing debt of, or equity interests in, the Debtor, (ii) impair or circumvent voting rights with respect to any plan proposed by the Debtor,

including the Plan, (iii) circumvent chapter 11 plan safeguards, such as those set forth in Bankruptcy Code sections 1125 and 1129, or (iv) classify claims or equity interests, compromise controversies, or extend debt maturities. Accordingly, the Sale neither impermissibly restructures the rights of the Debtor's creditors, nor impermissibly dictates a liquidating chapter 11 plan for the Debtor.

### **Sale Pursuant to Debtor's First Amended Plan of Liquidation**

SS.    Concurrently with the Sale Hearing, the Court held a hearing to consider confirmation of the Plan.  The Plan contemplates the Sale of the Hotel Property, as a necessary and integral component to the Plan, and prescribes the procedures by which the proceeds of the Sale shall be distributed to all creditors and interest holders.  The Court confirmed the Plan, as announced in open court, and will enter a written Order confirming the Plan (the "Confirmation Order").

TT.    The Plan provides, among other things, that to the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfer of property under the Plan, including the Sale of the Hotel Property, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and that, upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment.

UU.    This Sale Order therefore incorporates the provisions of section 1146(a) of the Bankruptcy Code with respect to the Sale of the Hotel Property as set forth in the Agreements. The Sale of the Hotel Property and the Transactions are integral and necessary components to the

Plan and to confirmation thereof.  Accordingly, the Sale of the Hotel Property and the Transactions are deemed to be "under the Plan" for purposes of section 1146(a) of the Bankruptcy Code.

**IT IS HEREBY ORDERED THAT:**

1.      **Relief Granted.** The Sale Motion is **GRANTED**. The relief requested in the Sale Motion and the Transactions are approved for the reasons set forth in this Sale Order and on the record of the Sale Hearing, which are incorporated herein as if fully set forth in this Sale Order.

2.      **Objections Overruled.** Except as otherwise provided herein, all objections to the Sale Motion and the relief requested therein that have not been withdrawn, waived, or settled by the terms of this Sale Order, including, without limitation, any and all reservations of rights included in such objections or otherwise, are hereby denied and overruled on the merits, with prejudice. Those parties who did not object, or withdrew their objections, to the Sale Motion are deemed to have consented to the Sale of the Hotel Property as provided for herein pursuant to Bankruptcy Code section 363(f)(2). All objections to the assumption and assignment of the Assigned Contracts, including, but not limited to Cure Amounts and adequate assurance in connection therewith, that have not been withdrawn, waived, or settled by the terms of this Sale Order are hereby denied and overruled on the merits, with prejudice.

3.      **Objection of Orange County Tax Collector Sustained**.  The *Limited Objection of Scott Randolph, Orange County Tax Collector, to Debtor's Motion for Entry of an Order Approving the Sale of the Debtor's Hotel Property Free and Clear of All Liens, Claims, Encumbrances, and Interests* (Doc. No. 278) filed by Scott Randolph, Orange County Tax Collector (the "Tax Collector"), is sustained.  Notwithstanding anything else contained herein to the contrary, the Debtor shall pay the 2020 real property and tangible personal property taxes in full, plus any statutory interest and fees, at closing of the Sale pursuant to the Plan.  In addition,

the sale of the real and personal property subject to tax shall be subject to, and not free and clear of the Tax Collector's liens for real and personal property taxes for the year 2021 and subsequent years, which lien is defined as a Permitted Exception under the Agreements.

4.    **Prior Findings and Conclusions Incorporated.** This Court's findings of fact and conclusions of law set forth in the Bid Procedures Order are incorporated herein by reference.

5.    **Sale Order and Agreements Binding on All Parties.** This Sale Order and the Agreements shall be binding in all respects upon all creditors (including all of their respective successors, assigns, and representatives) of and holders of equity interests in the Debtor (whether known or unknown), agents, trustees and collateral trustees, holders of Interests in, against, or on the Hotel Property, or any portion thereof, all Contract Counterparties and any other non-Debtor parties to any contracts with the Debtor (whether or not assigned), the Debtor, all successors and assigns of the Debtor, and any subsequent trustees appointed in the Bankruptcy Case or upon a conversion of the Bankruptcy Case to a case under chapter 7 of the Bankruptcy Code and shall not be subject to rejection or unwinding. Nothing in the Plan or the Confirmation Order, any order approving the wind down or dismissal of the Bankruptcy Case, or any order entered upon the conversion of the Bankruptcy Case to a case under chapter 7 of the Bankruptcy Code or otherwise shall conflict with or derogate from the provisions of the Agreements or this Sale Order.

### Approval of the Agreements

6.    **Agreements Approved.** The Agreements, the exhibits thereto and all other ancillary documents, and all of the terms and conditions thereof, are hereby approved.

7.    **Authorization to Consummate Transactions.** Pursuant to Bankruptcy Code sections 363(b) and (f), the Debtor is authorized, empowered, and directed to take any and all actions necessary or appropriate to (a) consummate the Sale and the Transactions pursuant to and in accordance with the terms and conditions of the Agreements, (b) close the Sale and the

Transactions as contemplated in the Agreements and this Sale Order, and (c) execute and deliver, perform under, consummate, implement, and fully close the Agreements, including the assumption and assignment to Purchaser or Back-Up Purchaser, as the case may be, of the Assigned Contracts, in accordance with the procedures set forth in the Agreements and this Sale Order, together with additional instruments and documents that Purchaser or Back-Up Purchaser, as the case may be, may deem reasonably necessary or desirable to implement the Agreements, the Sale, and the Transactions.

### Transfer of the Hotel Property

8.      **Transfer of the Hotel Property Authorized.** Pursuant to Bankruptcy Code sections 105(a), 363(b), and 363(f), the Debtor is authorized and directed to transfer title to the Hotel Property to Purchaser or the Back-Up Purchaser, as the case may be, on the applicable Closing Date, and such transfer shall constitute a legal, valid, binding, and effective transfer of such Hotel Property and shall vest Purchaser or the Back-Up Purchaser, as the case may be, with title to the Hotel Property, subject to the terms of the Agreements and this Sale Order. Notwithstanding anything to the contrary herein or in the Agreements, the Purchasers may immediately terminate the Agreements and shall be entitled to a return of their applicable Deposit (as defined in the Agreements) if this Sale Order is withdrawn for any reason.

9.      **Direction to Surrender or Turn Over Hotel Property by Third Parties.** Except as otherwise agreed by Purchasers, all persons and entities that are in possession of any of the Hotel Property on the Closing Date shall surrender possession of such Hotel Property to Purchaser or the Back-Up Purchaser, as the case may be, or their designee as soon as practicable and no later than the applicable Closing Date. The Purchaser or Back-Up Purchaser, as the case may be, shall take possession of the Hotel Property "as is/where is" and pay all costs directly and reasonably associated with taking possession of the Hotel Property and, if applicable, de-identifying the Hotel

as a Crowne Plaza Hotel. On the Closing Date, each of the Debtor's creditors are authorized, ordered, and directed to execute such documents and take such other actions as Purchaser or Back-Up Purchaser, as the case may be, or Debtor may deem reasonably necessary to release their Interests in the Hotel Property, if any, as such Interests may have been recorded or may otherwise exist. All persons are hereby forever prohibited and enjoined from taking any action that would adversely affect or interfere with the ability of the Debtor to sell and transfer the Hotel Property to Purchasers in accordance with the terms of the Agreement and this Sale Order. The Court specifically reserves jurisdiction to enter appropriate orders requiring parties to comply with their obligation to turnover Hotel Property to the Purchaser or Back-Up Purchaser, as the case may be. Except as otherwise expressly provided herein, following the Closing (as defined in the Agreement), no holder of any Claim or Interest shall interfere with Purchaser's or Back-Up Purchaser's, as the case may be, title to or use or enjoyment of the Hotel Property based on or related to any Claim or Interest or based on any actions or omissions by the Debtor, including any actions or omissions the Debtor may take in this chapter 11 case.

10.    **Transfer Free and Clear of Interests.** Upon the Closing, and except for the Permitted Exceptions specifically set forth in the Agreements, which shall be assumed by Purchasers, the transfer of the Hotel Property to Purchaser or the Back-Up Purchaser, as the case may be, shall be free and clear of all Interests of any kind or nature whatsoever, including, without limitation, (a) successor or successor-in-interest liability, (b) Claims, and (c) any and all Designated Contracts (as defined in the Agreements) not assumed and assigned to Purchaser or Back-Up Purchaser, as the case may be, pursuant to the terms of the Agreements, with all such Interests to attach to the proceeds received by the Debtor ultimately attributable to the Hotel Property against, or in, which such Interests are asserted, subject to the terms thereof, with the

same validity, force, and effect, and in the same order of priority, which such Interests now have against the Hotel Property, subject to any rights, claims, and defenses that the Debtor or its estate, as applicable, may possess with respect thereto.

11.    **Legal, Valid, and Marketable Transfer with Permanent Injunction.** The transfer of the Hotel Property to Purchaser or Back-Up Purchaser, as the case may be, upon the Closing pursuant to the Agreements constitutes a legal, valid, and effective transfer of good and marketable title of the Hotel Property, and vests, or will vest, as of the Closing Date, Purchaser or Back-Up Purchaser, as the case may be, with all right, title, and interest to the Hotel Property, free and clear of all Interests (other than Permitted Exceptions), and all such Interests shall attach to the proceeds of the Sale received by the Debtor ultimately attributable to the specific Hotel Property, in the same order of priority, with the same validity, force, and effect that such Interests had prior to the Sale in such specific Hotel Property (subject to any claims and defenses the Debtor and its estate may possess with respect thereto). Except as provided in the Agreements with respect to Permitted Exceptions, all Persons holding Interests or Claims of any kind or nature whatsoever against the Debtor or the Hotel Property, the operation of the Hotel Property prior to the Closing Date, the Auction or the Sale are hereby and forever barred, estopped, and permanently enjoined from asserting against Purchaser or Back-Up Purchaser, as the case may be, their successors or assigns, their property, or the Hotel Property, any claim, interest, or liability existing, accrued, or arising prior to the Closing.

12.    **Recording Offices and Releases of Interests.** On the Closing Date, this Sale Order shall be construed and shall constitute for any and all purposes a full and complete assignment, conveyance, and transfer of the Hotel Property or a bill of sale transferring good and marketable title of the Hotel Property to Purchaser or Back-Up Purchaser, as the case may be. This Sale Order is

and shall be effective as a determination that, on the Closing Date, all Interests of any kind or nature whatsoever existing as to the Hotel Property prior to the Closing date, other than Permitted Exceptions, or as otherwise provided in this Sale Order, shall have been unconditionally released, discharged, and terminated, and that the conveyances described herein have been affected, and all such Interests will attach to the proceeds of the Sale received by the Debtor ultimately attributable to the Hotel Property, in the same order of priority, with the same validity, force, and effect that such Interests had prior to the Sale (subject to any claims and defenses the Debtor and its estate may possess with respect thereto). This Sale Order is and shall be binding upon and govern the acts of all persons, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal and local officials, and all other persons who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease; and each of the foregoing persons is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the Agreements. Each and every federal, state, and local governmental agency or department is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Agreements. A certified copy of this Sale Order may be: (a) filed with the appropriate clerk; (b) recorded with the recorder; and/or (c) filed or recorded with any other governmental agency to act to cancel any Interests against the Hotel Property, other than the Permitted Exceptions.

13.    **Continuation of Existing Approvals**.  To the fullest extent permitted by applicable law, the Purchaser or Back-Up Purchaser, as the case may be, shall be authorized, as of the Closing

Date, to operate under any license, permit, registration, and governmental authorization or approval of the Debtor with respect to the Hotel Property (subject, in each case, to the terms of the Agreements), other than the License Agreement between the Debtor and Holiday Hospitality Franchising, Inc., and all such licenses, permits, registrations, and governmental authorizations or any other approvals are deemed to have been, and hereby are, directed to be transferred to the Purchaser or Back-Up Purchaser, as the case may be, as of the Closing Date. All existing licenses or permits applicable to the business, other than the License Agreement, shall remain active, in place, and, as applicable, shall be renewed for the Purchaser's benefit until either new licenses and permits are obtained or existing licenses and permits are transferred in accordance with applicable administrative procedures. To the maximum extent permitted by section 525 of the Bankruptcy Code, no governmental unit may revoke or suspend, or in any way challenge or fail to consent to any renewal of any permit or license relating to the operation of the Hotel Property because of the filing or pendency of the Debtor's chapter 11 case or the consummation of the Transactions.

14.    **Cancellation of Third-Party Interests.** If any person or entity which has filed statements or other documents or agreements evidencing Interests on or in all or any portion of the Hotel Property (other than Permitted Exceptions) has not delivered to the Debtor prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements, and any other documents necessary for the purpose of documenting the release of all Interests that such person or entity has or may assert with respect to all or a portion of the Hotel Property, then the Debtor and Purchasers are authorized to execute and file such statements, instruments, releases and other documents on behalf of such person or entity with respect to the Hotel Property. Notwithstanding the foregoing, subject to the satisfaction or waiver of the conditions precedent to Closing set forth in the Agreement, the

provisions of this Sale Order authorizing the transfer of the Hotel Property free and clear of all Interests (other than Permitted Exceptions) shall be self-executing, and it shall not be, or be deemed, necessary for any person or entity to execute or file releases, termination statements, assignments, consents, or other instruments in order for the provisions of this Sale Order to be implemented.

**Assumption and Assignment of Assigned Contracts**

15.    **Approval of Assumption and Assignment.** The Debtor is authorized to assume and assign the Assigned Contracts to the Purchaser or Back-Up Purchaser, as the case may be, as of the Closing Date pursuant to sections 363 and 365 of the Bankruptcy Code.

16.    The Assigned Contracts shall be transferred to, and remain in full force and effect for the benefit of, the Purchaser or Back-Up Purchaser, as the case may be, in accordance with their respective terms, notwithstanding (a) any provision in any such Assigned Contract (including those of the type described in sections 365(b)(2) and (f) of the Bankruptcy Code) that prohibits, restricts, or conditions such assignment or transfer or (b) any default by the Debtor under any such Assigned Contract or any disputes between the Debtor and a Contract Counterparty with respect to any such Assigned Contract.  In particular, upon the assumption and assignment of the Assigned Contracts: (i) any provisions in any Assigned Contract that restrict, prohibit, or condition the assignment of such Assigned Contract or allow the Contract Counterparty to such Assigned Contract to terminate, recapture, impose any penalty, condition on renewal or extension or modify any term or condition upon the assignment of such Assigned Contract constitute unenforceable anti-assignment provisions that are void and of no force and effect; and (ii) each party to an Assigned Contract is forever barred, estopped, and permanently enjoined from asserting against Purchaser Back-Up Purchaser, as the case may be, or their property or affiliates, or successors and assigns, any breach or default under any Assigned Contract, any claim of lack of consent relating to the

assignment thereof, or any counterclaim, defense, setoff, right of recoupment or any other matter for such Assigned Contract or with regard to the assumption and assignment therefore pursuant to the Agreements or this Sale Order. Upon the payment of the applicable Cure Amount, if any, the Assigned Contracts will remain in full force and effect, and no default shall exist under the Assigned Contracts nor shall there exist any event or condition which, with the passage of time or giving of notice, or both, would constitute such a default. As of the Closing Date, the Purchaser or Back-Up Purchaser, as the case may be, shall be fully and irrevocably vested with all right, title, and interest of the Debtor under the Assigned Contracts.

17.     Pursuant to sections 365(b)(1)(A) and (B) of the Bankruptcy Code, and except as otherwise provided by this Sale Order and the Agreements, the Debtor shall promptly pay the Cure Amount relating to any Assigned Contract, if any, as set forth in the Cure Notice served by the Debtor on each Contract Counterparty (as modified herein or as may be modified in accordance with this Sale Order and the Agreements), or as determined by mutual agreement between the Debtor and a Contract Counterparty, or as determined by the Court, following notice and a hearing, in connection herewith.

18.     **Section 365(k).** Upon the Closing and the payment of the applicable Cure Amount, Purchaser or Back-Up Purchaser, as the case may be, shall be deemed to be substituted for the Debtor as a party to the applicable Assigned Contracts and the Debtor and its estate shall be relieved, pursuant to section 365(k) of the Bankruptcy Code, from any further liability under the Assigned Contracts.

19.     **No Fees.** There shall be no rent accelerations, assignment fees, increases, or any other fees charged to Purchasers or the Debtor as a result of the assumption and assignment of the Assigned Contracts.

20.    **Injunction.** Pursuant to sections 105(a), 363, and 365 of the Bankruptcy Code, other than the right to payment of the applicable Cure Amount, if any, all Contract Counterparties to the Assigned Contracts are forever barred and permanently enjoined from raising or asserting against the Debtor or the Purchaser or Back-Up Purchaser, as the case may be, any assignment fee, default, breach or claim, or pecuniary loss arising under or related to the Assigned Contracts existing as of the Petition Date or any assignment fee or condition to assignment arising by reason of the Closing.

21.    **No Further Debtor Liability.** Except as provided in the Agreements or in this Sale Order, after the Closing, the Debtor and its estate shall have no further liabilities or obligations with respect to any Assigned Contracts or Permitted Exceptions, and all holders of such Claims are forever barred and estopped from asserting such Claims against the Debtor, its successors or assigns, its property, or the Debtor's estates.

22.    **No Waiver of Rights.** The failure of the Debtor or either of the Purchasers to enforce, at any time, one or more terms or conditions of any Assigned Contracts shall not be a waiver of any such terms or conditions, or of the Debtor's or Purchasers' rights to enforce every term and condition of the Assigned Contracts.

<u>**Prohibition of Actions Against Purchaser**</u>

23.    **No Successor Liability.** Except for the Permitted Exceptions, or as otherwise expressly provided for in this Sale Order or the Agreement, the Purchaser or Back-Up Purchaser, as the case may be, and their affiliates shall not assume or be responsible for any liability or other obligation of the Debtor arising under or related to any of the Hotel Property including, without limitation, under any theory of antitrust, environmental, successor, or transfer reliability, labor law, *de facto* merger, mere continuation, or substantial continuity, whether known or unknown as of the Closing Date, now existing, or hereafter arising, whether fixed or contingent, whether asserted

or unasserted, whether legal or equitable, with or liquidated or unliquidated, including, without limitation, liabilities on account of warranties, intercompany loans, environmental liabilities, and any taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the operation of any of the Hotel Property prior to the Closing.  The Purchasers and their affiliates shall not be deemed as a result of the Sale, to (a) be a legal successor to the Debtor or its estate by any theory of law or equity, (b) have, de facto or otherwise, merged with or into the Debtor, or (c) be an alter ego or a mere continuation or substantial continuation or successor of the Debtor in any respect.

24.    **Actions Against Purchasers Enjoined**. Except with respect to Permitted Exceptions, or as otherwise permitted by the Agreements or this Sale Order, all persons and entities, including, without limitation, all debt security holders, equity security holders, governmental, tax, and regulatory authorities, lenders, trade creditors, litigation claimants, and other creditors, holding Interests of any kind or nature whatsoever against, or in, all or any portion of the Hotel Property, arising under, out of, in connection with, or in any way relating to, the Debtor, the Hotel Property, the operation of the Debtor's business prior to the Closing Date, or the transfer of the Hotel Property to Purchaser, hereby are forever barred, estopped, and permanently enjoined from asserting against Purchaser or Back-Up Purchaser, as the case may be, or any of their affiliates, successors, or assigns, or their property or the Hotel Property, such persons' or entities' Interests in and to the Hotel Property, including, without limitation, the following actions against Purchaser or the Back-Up Purchaser, as the case may be, or their affiliates, or their successors, assets, or properties: (a) commencing or continuing in any manner any action or other proceeding in any manner or place, that does not comply or is inconsistent with the provisions of this Sale Order or other orders of this Court, or the agreements or actions contemplated or taken

in respect thereof; (b) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or other order; (c) creating, perfecting, or enforcing any Lien or other Claim; (d) asserting any set off, right of subrogation, or recoupment of any kind; or (e) revoking, terminating, or failing or refusing to transfer or renew any license, permit, or authorization to operate any of the Hotel Property or conduct any of the business operated with the Hotel Property.

## Other Provisions

25.    **Effective Immediately.** For cause shown, pursuant to Bankruptcy Rules 6004(h), 6006(d), and 7062(g), this Sale Order shall not be stayed and shall be effective immediately upon entry, and the Debtor and Purchaser or Back-Up Purchaser, as the case may be, are authorized to close the Sale immediately upon entry of this Sale Order. The Debtor and Purchaser or Back-Up Purchaser, as the case may be, may consummate the Agreement or the Back-Up Agreement, as applicable, at any time after entry of this Sale Order by waiving any and all closing conditions set forth in the Agreements that have not been satisfied and by proceeding to close the Sale without any notice to the Court or any party in interest.

26.    **Access to Books, Records and Personnel.** Following the Closing of the Sale, for a period of 180 days thereafter, the Debtor, the Liquidating Debtor, and the Liquidating Trustee (as defined in the Plan) shall have, and Purchaser or Back-Up Purchaser, as the case may be, shall provide, reasonable access to the Seller's books and records (at reasonable times during normal business hours), to the extent they are included in the Hotel Property transferred to Purchaser or Back-Up Purchaser, as the case may be, as part of the Sale. Additionally, following the Closing, to the extent that Purchaser or Back-Up Purchaser, as the case may be, employs any management level employees of Seller, Purchaser agrees that such employees may, while in the employ of Purchaser or Back-Up Purchaser, as the case may be, assist in the wind-down activities for Seller; provided, that, such assistance does not materially interfere with, hinder or delay such management

level employee's discharge of his or her employment duties to Purchaser or Back-Up Purchaser. In connection with the foregoing, the Purchaser or Back-Up Purchaser, as the case may be, may, in its sole discretion, assess the costs incurred by the Purchaser or Back-Up Purchaser, as the case may be, in connection with the provision of access to such books, records, and personnel, against the Debtor, the Liquidating Debtor, or the Liquidating Trustee (as applicable).

27.     **Sale Transactions Exempt Under Section 1146(a)**.    To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, and pursuant to the Confirmation Order, the transfer of the Hotel Property as contemplated in the Agreements and pursuant to the Transactions is deemed to have arisen under the Plan, and is a necessary and integral part of the Plan, and, accordingly, such transfer and Transactions shall not be subject to any documentary stamps on the deed and any mortgage; intangible tax on any mortgage; any real estate transfer, mortgage recording, sales, use, or other similar tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and that, upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment.

28.     **Closing Statement.**  The Liquidating Debtor or Liquidating Trustee shall file with the Court a true and correct copy of the closing statement for the Sale no later than ten (10) days after the Closing Date.

29.     **Auctioneer Report.**  Auctioneer is directed to file an itemized statement pursuant to Bankruptcy Rule 6004(f)(1).

30.     **Bulk Sales Law.** No bulk sales law or any similar law of any state or other jurisdiction applies in any way to the Sale.

31.    **Release of Initial Deposits.** Upon the entry of this Sale Order, Fidelity National Title, as Escrow Agent, is authorized and directed to disburse the Initial Deposits made by all Bidders that are not the Purchaser or the Back-Up Purchaser.  Upon release of such Initial Deposits, Fidelity National Title shall be discharged of any duties or liability owed to such parties under the Bid Procedures Order and the Escrow Agreements.

32.    **Agreement Approved in Entirety.** The failure specifically to include any particular provision of the Agreements in this Sale Order shall not diminish or impair the effectiveness of such provision, it being the intent of this Court that the Agreements be authorized and approved in their entirety.

33.    **Modifications to Agreement.** The Agreements and any related agreements, documents or other instruments may be modified, amended, or supplemented by the parties thereto and in accordance with the terms thereof, in a writing signed by such parties, without further order of this Court, provided that any such modification, amendment or supplement does not have a material adverse effect on the Debtor's estate.

34.    **Rights of Holiday Hospitality Franchising.**  Notwithstanding any provision(s) of this Sale Order to the contrary, nothing in this Sale Order shall affect the rights of Holiday Hospitality Franchising, LLC ("HHF"), under, with respect to, or related to the License Agreement (as defined in the Agreements), and the terms, conditions, and obligations set forth in paragraph 11 of the Agreements, may not be modified or impaired in any way without the express written consent of HHF.  The assumption of the License Agreement by the Debtor, and the termination of the License Agreement after the closing of the Sale, are further addressed in the Confirmation Order.

35.    **Enforcement.**    The terms of the Agreements and the Transactions may be specifically enforced against and are binding upon, and not subject to rejection or avoidance by, the Debtor.

36.    **Standing.** The transactions authorized herein shall be of full force and effect, regardless of any Debtor's lack of good standing in any jurisdiction in which such Debtor is formed or authorized to transact business.

37.    **Authorization to Effect Order.** The Debtor is authorized to take all actions necessary to effect the relief granted pursuant to this Sale Order in accordance with the Sale Motion.

38.    **Automatic Stay.** The automatic stay pursuant to Bankruptcy Code section 362 is hereby modified and lifted with respect to the Debtor and Purchaser or Back-Up Purchaser, as the case may be, to the extent necessary, without further order of this Court, to (a) allow Purchaser or Back-Up Purchaser to deliver any notice provided for in the Agreement, (b) allow Purchaser or Back-Up Purchaser to take any and all actions permitted under the Agreements in accordance with the terms and conditions thereof, and (c) allow HHF to take any actions to enforce its rights and remedies with respect to the License Agreement (as defined in the Agreements) to the extent permitted by the Confirmation Order.

39.    **No Other Bids.** No further bids or offers for the Hotel Property shall be considered or accepted by the Debtor after the date hereof unless the Sale to Purchaser or the Back-Up Purchaser are not consummated or otherwise do not occur in accordance with the Agreements or its related documents.

40.    **Order to Govern.** To the extent that this Sale Order is inconsistent with any prior order entered or pleading filed in the Bankruptcy Case, the terms of this Sale Order shall govern.

To the extent there are any inconsistencies between the terms of this Sale Order and the Agreements (including all ancillary documents executed in connection therewith), the terms of this Sale Order shall govern.

41.     **Retention of Jurisdiction.** The Court shall retain jurisdiction to interpret and enforce this Sale Order and to adjudicate any disputes arising from or relating to the Agreements, the Transactions, or any other matters pertaining to the Sale.

42.     **Notice of Further Hearing/Status Conference.** The Court shall conduct a further hearing/status conference (the "Further Hearing") in this case **April 21, 2021 at 2:30 p.m**. in order to (i) receive an update on the closing of the Transactions under the Agreement, (ii) consider the Assignment Motion, if applicable, and (iii) receive a general status report from the Debtor.

### 

*Attorney Christopher R. Thompson is directed to serve a copy of this Order on interested parties who are non-CM/ECF users and file a proof of service with 3 days of entry of this Order.*

# Exhibit A

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

In re:

UNIVERSAL TOWERS CONSTRUCTION,
INC.,

CASE NO. 6:20-bk-03799-KSJ
Chapter 11

Debtor.

_____/

## NOTICE OF FILING

Debtor, Universal Towers Construction, Inc., by and through its undersigned counsel,

hereby gives notice of filing of the attached Purchase and Sale Agreement between Universal

Towers Construction, Inc. and MAC New Opportunities, LLC.

*/s/ Christopher R. Thompson*
**Eric S. Golden**
Florida Bar No. 146846
Email: egolden@burr.com
**Christopher R. Thompson**
Florida Bar No. 0093102
Email: crthompson@burr.com
**BURR & FORMAN, LLP**
200 S. Orange Ave., Suite 800
Orlando, Florida 32801
Phone: (407) 540-6600
*Attorneys for Debtor*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on March 17, 2021, I electronically filed the foregoing with the

Clerk of the Court by using the CM/ECF system which will send electronic notice to all parties

registered to receive electronic notice.

*/s/ Christopher R. Thompson*
Christopher R. Thompson

**THIS AGREEMENT WILL TAKE EFFECT UPON ENTRY OF THE <u>SALE ORDER</u> CONFIRMING THE <u>SUCCESSFUL BID</u>, AND WILL THEN BECOME BINDING ON THE <u>SUCCESSFUL BIDDER</u>. BY SUBMITTING ITS BID AND PARTICIPATING IN THE <u>AUCTION</u>, EACH BIDDER BINDS ITSELF TO, AND BECOMES OBLIGATED TO EXECUTE AND PERFORM UNDER THIS AGREEMENT, IN THE EVENT THE BIDDER SUCCEEDS IN THE <u>AUCTION</u> OR IS DESIGNATED THE <u>BACK-UP BIDDER</u>.  UNDERLINED TERMS IN THE FOREGOING STATEMENT ARE DEFINED BELOW IN THE TEXT OF THIS AGREEMENT.**

PURCHASE AND SALE AGREEMENT

BETWEEN

UNIVERSAL TOWERS CONSTRUCTION, INC., a Florida Corporation,
AS CHAPTER 11 DEBTOR IN POSSESSION

as Seller

AND

MAC NEW OPPORTUNITIES LLC, a Delaware Limited Liability Company

as Buyer

Property: 7800 Universal Boulevard

Orlando, Florida 32819

Dated as of: _____3/16/2021_____, 2021

THIS PURCHASE AND SALE AGREEMENT (this "**Agreement**") is entered into as of the Effective Date (defined below) between UNIVERSAL TOWERS CONSTRUCTION, INC., a Florida Corporation, as debtor in possession (the "**Debtor**" or "**Seller**") and MAC NEW OPPORTUNITIES LLC, a Delaware Limited Liability Company (the "**Buyer**").  Buyer and Seller are sometimes collectively referred to below as the "**Parties**" and each individually as a "**Party**."

## RECITALS

WHEREAS, Debtor is the owner of the real property located at 7800 Universal Boulevard, Orlando, Florida 32819, together with all improvements thereon and appurtenances thereunto, (the "**Land**") which Land is described on **Exhibit "A"** hereto.

WHEREAS, The Land is improved, and is operated, as a Crowne Plaza hotel containing 400 hotel rooms.  References below to the "**Hotel**" mean the hotel business operated on the Land.

WHEREAS, On July 3, 2020, Debtor filed a voluntary petition for relief under Chapter 11, Title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Middle District of Florida – Orlando Division (the "**Bankruptcy Court**"). The case is pending in the Bankruptcy Court as Case No. 6:20-bk-03799-KSJ (the "**Bankruptcy Case**"). Debtor's bankruptcy estate is referred to herein as the "**Estate**."

WHEREAS, On December 8, 2020, the Bankruptcy Court entered the Bid Procedures Order (as defined below), thereby authorizing the Debtor to sell the Hotel by auction pursuant to the Bid Procedures attached thereto as Exhibit A.

WHEREAS, On March 16, 2021, Debtor conducted the Auction and has designated the Buyer as the [check one]:

☑ The Successful Bidder

☐   The Back-Up Bidder

WHEREAS, Debtor believes that it is in the best interests of the Estate to sell the Property (defined below) to Buyer, and the Buyer wishes to purchase the Property from the Debtor, all subject to the approval of the Bankruptcy Court and as more particularly provided below.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

## AGREEMENT

1. <u>Definitions</u>.  In addition to all other defined terms contained in this Agreement, each term listed below shall have the meaning prescribed for that term:

    a. "**Accounts Receivable**" means all amounts which Seller is entitled to receive from the Hotel operations but has not received as of the Closing, including, without limitation, charges for the use or occupancy of any guest, conference, or banquet rooms or other facilities at the Land, any restaurant, bar, or banquet services, or any other goods or services provided by or on behalf of Seller at the Hotel, but expressly excluding all: (a) credit card charges, checks, and other instruments which Seller has submitted for payment as of the Closing; and (b) items of income otherwise prorated pursuant to this Agreement.

b.  "**Auction**" means the live online-only auction to be conducted pursuant to that certain Bid Procedures Order and the Bid Procedures.

c.  "**Back-Up Bid**" means the next highest and best bid submitted at the Auction after the Successful Bid, in the amount of $35,600,000.00, as determined by the Seller in its sole discretion

d.  "**Back-Up Bidder**" means the bidder who the Debtor deems to have submitted the Back-Up Bid.

e.  "**Bid Procedures Order**" means that certain *Order (1) Approving Bidding Procedures for the Sale of Debtor's Hotel Property, (2) Scheduling Dates to Conduct Auction and Sale Hearing, (3) Approving the Form and Manner of Notices, (4) Approving the Sale of the Hotel Free and Clear of All Liens, Claims, and Encumbrances and Interests, (5) Approving Assumption and Assignment Procedures, and (6) Granting Related Relief*, which the Bankruptcy Court entered on December 8, 2020 (Doc. No. 208) in the Bankruptcy Case.

f.  "**Bid Procedures**" means those certain Bid Procedures approved by the Bankruptcy Court for the sale and auction of the Property pursuant to the Bid Procedures Order.

g.  "**Bookings**" means all bookings and reservations for guest, conference, and banquet rooms or other facilities at the Hotel as of the Closing, together with all deposits held by Seller with respect thereto.

h.  "**Closing**" shall mean the consummation of the conveyance of the Property (defined below) to Buyer and receipt of the Purchase Price (also defined below) by Seller, and the satisfaction or waiver of all other conditions for closing prescribed by this Agreement.

i.  "**Data Room**" means the online data room maintained by Fisher Auction Company, which contains material information with respect to the Property.

j.  "**Effective Date**" means the date the Sale Order is entered by the Bankruptcy Court.

k.  "**Escrow Agent**" means Fidelity National Title Insurance Company.

l.  "**Guest Ledger**" means all charges accrued to the open accounts of any guests or customers at the Hotel as of the Cut-Off Time (as defined below) for the use or occupancy of any guest, conference, or banquet rooms or other facilities at the Hotel, any restaurant, bar, or banquet services, or any other goods or services provided by or on behalf of Seller at the Hotel.

m.  "**Lien**" means "any interest in" the Property as used in Section 363(f) of the Bankruptcy Code and includes any lien (including any tax lien or judgment lien), pledge, security interest, mortgage or lis pendens, contracts, options or other rights to acquire any other interest in the Property, but does not include any easements or restrictions of record.

n.  "**Person**" means any natural person, corporation, company, partnership, proprietorship, joint venture, association, joint stock company, trust, foundation, fund, institution, society, union, club, or other group organized for any purpose, whether or not incorporated, wherever located and of whatever citizenship, or any receiver, trustee in bankruptcy or

similar official, any liquidating agent for any of the foregoing, any trustee or executor in his capacity as such or any government or agency or political subdivision thereof.

o. "**Purchase Price**" means either (i) if this Agreement is submitted by the Successful Bidder: the Successful Bid amount plus all costs necessary to cure the Assigned Contracts, as described in paragraph 2.b.ii; or (ii) if this Agreement is submitted by the Back-Up Bidder: the Back-Up Bid Amount plus all costs necessary to cure the Assigned Contracts, as described in paragraph 2.b.ii.  For the purpose of clarity, the Purchase Price does not include the Buyer's Premium (as defined in paragraph 18)

p. "**Retail Merchandise**" means all merchandise held for sale to guests and customers of the Hotel, or ordered for future sale at the Hotel as of the Closing, including, without limitation, the inventory held for sale in any gift shop, pro shop, or newsstand.

q. "**Section**" means each provision of this Agreement included under any underlined heading or title.  Each Section shall include all clauses and paragraphs contained between the underlined heading for that Section and the underlined heading of the following Section.

r. "**Stalking Horse Bid Amount**" means $28,250,000.00, the bid submitted by the Stalking Horse Bidder for the purchase of the Property.

s. "**Stalking Horse Bidder**" means 7800 Universal Boulevard Orlando Owner, LLC, a Delaware limited liability company.

t. "**Successful Bid**" means the highest and best bid submitted at the Auction in the amount of $35,700,000.00, as determined by the Seller in its sole discretion.

u. "**Successful Bidder**" means the bidder at the Auction who is deemed by the Seller to have submitted the Successful Bid.

v. "**Taxes**" means any federal, state, local, or foreign real property, personal property, sales, use, room, occupancy, ad valorem, or similar taxes, assessments, levies, charges, or fees levied with respect to the Property or to operations thereon, including, without limitation, any interest, penalty, or fine with respect thereto, but expressly excluding any: (a) federal, state, local, or foreign income, capital gain, gross receipts, capital stock, franchise, profits, estate, gift, or generation skipping tax; or (b) transfer, documentary stamps on the deed and any mortgage; intangible tax on any mortgage; recording, or similar tax, levy, charge, or fee incurred with respect to the transaction described in this Agreement; *provided*, that Seller shall request that the Bankruptcy Court include a provision in the Sale Order providing that the transfer of the Property shall be exempt from any documentary stamps on the deed and any mortgage, intangible tax on any mortgage, and any real estate transfer, sales, use, or other similar tax, pursuant to Section 1146(a) of the Bankruptcy Code, as set forth herein.

Any terms not defined in this agreement shall have the meaning as defined in Bid Procedures Order and the Bid Procedures; or 11 U.S.C. § 101.  Defined terms may be used in the singular or the plural.  When used in the singular preceded by "a," "an," or "any," such term shall mean one or more members of the relevant class.  When used in the plural, such term shall mean some or all, as applicable in the context, of the members of the relevant class.

2. <u>Sale and Purchase of Property</u>. Subject to the terms and conditions of this Agreement and to the Sale Order, and subject in all events to the approval of the Bankruptcy Court, on the Closing Date (defined below), Seller shall sell, assign, transfer, convey and deliver, or cause to be sold, assigned, transferred, conveyed and delivered, to Buyer, and Buyer shall purchase and acquire from Seller, Seller's right, title, and interest in the following (collectively, the "**Property**"):

   a. The Land described in <u>Exhibit "A"</u> and located at 7800 Universal Boulevard, Orlando, Florida 32819, together with all of Seller's right, title, and interest in and to any property rights, easements, rights-of-way, hereditaments, appurtenances, entitlements, development rights, permits, approvals, and rights and profits derived from, related to, or appurtenant to the Land (collectively, the "**Easements and Ownership Rights**", and collectively with the Hotel and the Land, the "**Real Property**").

   b. All personal property located on or in the Real Property that belongs to Debtor and that is used in operations of the Hotel, other than any property specifically excluded herein (the "**Personal Property**"). The following provisions apply for determining personal property to be transferred to Buyer and, therefore, included in the Property:

      i. The Property does not include the balance of all cash and securities and other cash equivalent interests held by Seller, or for the benefit of Seller or the Hotel, and deposited, held, or contained in any account, bank, or vault, including, but excluding any deposits expressly addressed in the Section below titled "Prorations and Adjustments".

      ii. The Data Room includes a Schedule of Seller's rights, claims, and interests as a party to, or otherwise with respect to, service contracts, equipment leases, management agreements, franchises, licenses, and other arrangements and agreements that Seller may assign and Buyer may assume (collectively, "**Operations Agreements**"). At the Sale hearing, Seller shall request Bankruptcy Court authority for the assumption and assignment of all Operations Agreements that Buyer elects prior to the Sale hearing, on a preliminary basis, to assume (the "**Designated Contracts**"); and the Seller or the Bankruptcy Court shall determine any necessary cure costs required to be paid to any counterparty to the Designated Contracts upon assumption and assignment, and any other terms and conditions of assumption and assignment of such Designated Contracts. Not later than seven (7) days before the Closing Date, Buyer will specify in a notice to Seller which of the Designated Contracts the Bankruptcy Court has authorized to be assumed and assigned that Buyer desires to designate as part of the Property to be assigned to Buyer at Closing (the "**Assigned Contracts**"). Buyer shall be responsible to pay all cure costs associated with the assumption and assignment of the Assigned Contracts, and shall provide any proof of adequate assurance of future performance of such Assigned Contracts, and comply with any other requirements, as the Bankruptcy Court may order as a condition to assumption and assignment of such Assigned Contracts. The Assigned Contracts will be included in the Property, and

at Closing, Seller will assign and Buyer will expressly assume the Assigned Contracts. The Property does not include, and before Closing Seller will terminate, or Seller shall be deemed to reject, all other Designated Contracts and Operations Agreements.

    iii.    The Personal Property shall include all furniture, fixtures, and equipment; all supplies; computer hardware; transferable IT systems; food and beverage; inventories; Retail Merchandise; transferable licenses and permits; books and records relating to Hotel operations (including transferable guest data (excluding any private guest data protected by any applicable law), but excluding the corporate books and records of the Seller; bookings; transferable warranties; transferable intangible property (telephone numbers (including all "800" and "888" numbers for the Hotel), Hotel-specific internet domain, website, and related login information and the contents therein, and post office boxes); *provided* that Personal Property shall not include any of the foregoing items that Seller leases or licenses, and further shall not include any such items that are property of the hotel franchise licensor (HHF, as defined below) or the hotel management company, Aimbridge Hospitality, Inc. Seller is not obligated to transfer any of the foregoing items that Seller is prohibited by law or contract from transferring. Seller makes no warranties or representations whatsoever concerning the Personal Property.

3.    <u>Court Approval</u>. The parties' respective obligations to purchase and sell the Property pursuant to this Agreement are subject to: (a) Bankruptcy Court approval after notice and a hearing, and (b) the provisions, requirements, and limitations of the Sale Order (defined below).

4.    <u>Purchase Price</u>. Buyer will pay the Purchase Price to Seller in the following manner:

    a.    Upon submission of its Stalking Horse Bid, or, alternatively, in order to participate in the Auction, Buyer paid a deposit of FIVE HUNDRED THOUSAND AND NO/100 DOLLARS ($500,000.00) (the "**Initial Deposit**"), which is held by the Escrow Agent. On Buyer's becoming the Successful Bidder, the Initial Deposit shall become earnest money security for Buyer's performance of this Agreement and shall constitute a portion of the "Deposit."

    b.    Within 24 hours of becoming the Successful Bidder, Buyer shall deliver to Escrow Agent an additional deposit (the "**Additional Deposit**") the amount of which is the difference between 10% of the Successful Bid amount and the Initial Deposit (such that the sum of the Initial Deposit and the Additional Deposit together equal 10% of the Successful Bid). The Additional Deposit will be wire transferred to Escrow Agent to be held in escrow in accordance with this Agreement.

    c.    References in this Agreement to the "**Deposit**" mean the amount from time to time held by Escrow Agent pursuant to this Agreement. The Deposit will not accrue interest. At Closing, the Deposit will be delivered to Seller and applied toward payment of the Purchase Price due from Buyer.

    d. At Closing, Buyer will pay to Seller the balance of the Purchase Price (adjusted for prorations and other adjustments required in this Agreement) by wire transfer of immediate funds.

    e. Buyer will also pay at Closing the closing costs allocated in this Agreement to Buyer and the Buyer's Premium required in the Section below titled "Buyer's Premium".

5. <u>Time and Place of Closing.</u>  Unless (a) otherwise agreed to by the Seller and Buyer in writing, or (b) a stay is imposed by a court of competent jurisdiction, or (c) the Buyer under this Agreement is the Back-Up Bidder, the Closing shall occur not earlier than forty-five (45) calendar days after entry of the Sale Order, or at such other time as may be ordered by the Bankruptcy Court (the "**Closing Date**"). Notwithstanding any provisions to the contrary contained herein, so long as Buyer is not in default hereunder or has otherwise not caused delay of Closing, if Closing has not occurred within ninety (90) days after entry of the Sale Order, then Buyer shall have the option to terminate this Agreement and receive back its Deposit, whereupon the Parties shall be released from any further obligations hereunder except for those that survive Closing. If Buyer invokes this option to terminate, then Seller shall have the right in its discretion to cause Closing to occur within thirty (30) days after receiving notice of Buyer's election to terminate, in which event Buyer shall be obligated to close notwithstanding its previous election to terminate. If the Buyer under this Agreement is the Back-Up Bidder, then the Closing Date shall occur forty-five (45) days after Seller notifies the Back-Up Bidder that the Successful Bidder has failed to close on the purchase of the Property, or at such other time as Seller and Buyer may agree.  With respect to a Back-Up Bidder, this Agreement shall be deemed terminated, and the parties hereto shall be released from any and all obligations and liabilities hereunder, upon the Closing of the sale of the Property to the Successful Bidder.

    a. Closing will occur at the offices of Seller's legal counsel, Burr & Forman (the "**Closing Agent**"), 200 S. Orange Avenue, 8th floor, Orlando, Florida 32801.  The Closing shall be an escrow closing through the Closing Agent.

    b. Notwithstanding any other provision of this Agreement, time is of the essence with respect to the Closing Date.  No grace period, notice, or tender shall be required as a condition to declaring Buyer in immediate default for failure to timely to close.

    c. Buyer acknowledges receipt of a commitment for an ALTA owner's title insurance policy from Fidelity National Title Insurance Company (the "**Title Company**"), with an effective date of December 3, 2020, Order No. 9071222 (the "**Title Commitment**"), together with copies of all documents referenced therein.  At Buyer's request and at Buyer's expense, at Closing, Closing Agent will issue owner's and lender's title insurance policies at the promulgated rate applicable thereto, reduced by a full "Butler Rebate."

        i. For purposes of this Agreement, the "**Permitted Exceptions**" include those exceptions described in, and other title matters disclosed in, the Title Commitment, together with: (i) taxes for the year of Closing and subsequent years (Seller shall pay taxes for previous years); (ii) all matters appearing on the Survey; and (iii) other matters affecting the Property and disclosed by this Agreement.  Buyer accepts title for the Property subject to the Permitted Exceptions.

        ii. If Buyer requests issuance of owner's or lender's title insurance policy, not later than five (5) days before Closing, Seller will provide to Buyer an updated Title

Commitment bringing the effective date of the Title Commitment forward. If that updated Title Commitment reflects that title for the Property has since the previous effective date become subject to an adverse claim, defect, or other condition that is not a Permitted Exception (collectively, "**Subsequent Defects**"), unless Seller removes the Subsequent Defect such that the Title Company agrees to make no exception for it in the title insurance policy, Buyer will have the right in Buyer's discretion to terminate this Agreement by delivering written notice of termination to Seller before the Closing Date, in which event Escrow Agent shall return the Deposit to Buyer and the Parties shall be released from any further obligations under this Agreement, except for those that expressly survive termination of this Agreement. If Buyer fails before the Closing Date to deliver its notice of termination pursuant to this Section, Buyer shall be deemed to have waived the Subsequent Defects and elected to purchase the Property subject to them (and those Subsequent Defects shall become Permitted Exceptions).

d.  If the Bankruptcy Court does not discharge or remove from the title for the Real Property any monetary lien, mortgage, judgment, or other encumbrance securing payment for a liquidated sum (a "**Monetary Lien**"), then Seller may elect at or before Closing to satisfy or otherwise remove that Monetary Lien from title for the Real Property. If Seller fails or elects not to remove a Monetary Lien, the Buyer shall have the right before Closing to terminate this Agreement and receive back the Deposit.

e.  Buyer has reviewed and approved the Survey prepared by Associated Land Surveying & Mapping, Inc. dated January 15, 2021, bearing Job No. 20140 (the "**Survey**").

6.  <u>Conveyance of Property</u>. Subject to and in accordance with the provisions of this Agreement and the Sale Order, and subject to approval of the Bankruptcy Court, at Closing Seller shall execute and deliver to Buyer the following instruments for the purpose of transferring and conveying the Property to Buyer:

a.  Debtor's Quitclaim Deed (the "**Deed**") conveying the Real Property free and clear of all Liens in accordance with sections 363(b) and (f) of the Bankruptcy Code, with such Liens to attach to the proceeds of sale, but otherwise subject to the Permitted Exceptions.

b.  A general bill of sale and assignment conveying to Buyer all of the Personal Property, tangible and intangible, included in the Property (as specified in Section 2(b)), without warranty or representation whatsoever, except that the transfer shall be made subject only to such liens and encumbrances as are permitted by the Bankruptcy Court pursuant to the Sale Order.

c.  The Closing Statement (defined below).

d.  Assignment of Developer Rights, Permits, Agreements, Approvals, Fees and Deposits, provided that such Assignment shall be without any representations or warranties by the Seller whatsoever.

e.  Keys to the improvements located on the Property.

f.  Such other documents as may be customary, or as may be authorized or directed in the Sale Order, and documents reasonably required in order to perform this Agreement or to satisfy

DocuSign Envelope ID: 77106825-3742-4560-9116-AB7820A96518

reasonable legal concerns. Each closing document shall be consistent with and implement applicable provisions of this Agreement and with the Sale Order.

7. <u>Buyer's Documents</u>. Subject to and in accordance with the provisions of this Agreement and the Sale Order, and subject to approval of the Bankruptcy Court, at Closing Buyer shall execute and deliver the following instruments:

    a. The Closing Statement.

    b. Such other documents as may be customary, or as may be authorized or directed in the Sale Order, and documents reasonably required in order to perform this Agreement or to satisfy reasonable legal concerns. Each closing document shall be consistent with and implement applicable provisions of this Agreement and with the Sale Order.

8. <u>Closing Expenses.</u> Buyer will pay all costs of the Closing, and of transfer and conveyance of the Property, including without implied limitation documentary stamps required to be affixed to the deed, the cost of recording all instruments required to be recorded, the title insurance premiums and charges for related title services, costs and fees of the Closing Agent for closing services (up to, but not exceeding, $1,000.00), the fees and expenses of the Escrow Agent (up to, but not exceeding, $1,000.00), and the costs and fees for Buyer's own attorneys, accountants, and consultants; *provided*, that Seller shall request that the Bankruptcy Court include a provision in the Sale Order providing that the transfer of the Property shall be exempt from any documentary stamps on the deed and any mortgage; intangible tax on any mortgage; and any real estate transfer, mortgage recording, sales, use, or other similar tax, pursuant to Section 1146(a) of the Bankruptcy Code, as set forth herein. Buyer shall receive the maximum "Butler Rebate" on title insurance premiums charged to Buyer.

9. <u>Bankruptcy Court Approval</u>. Buyer's obligation to purchase, and Seller's obligation to sell, the Property are expressly contingent on and subject to the final entry by the Bankruptcy Court of the Sale Order (defined below in this Section) conforming to the requirements of this Agreement.

    a. If on or before April 30, 2021, the Bankruptcy Court has not entered the Sale Order conforming to the requirements of this Agreement, then either of Seller or Buyer may terminate this Agreement by delivering written notice to the other of the election to terminate. In the event of such a termination, Escrow Agent will return the Deposit to Buyer.

    b. Notwithstanding the foregoing, the appointment of a Chapter 11 trustee, or the conversion or dismissal of the Bankruptcy Case, shall NOT relieve the Buyer of its duties under this Agreement, absent further order of the Bankruptcy Court.

    c. Seller shall use commercially reasonable efforts to obtain Bankruptcy Court approval of the sale of the Property to the Buyer in accordance with this Agreement, and such order shall contain the following provisions (the "**Sale Order**"):

        i. a finding that Seller prepared and mailed a motion requesting entry of the Sale Order, and such motion and notice were proper and sufficient as to all parties entitled to it;

        ii. the sale and transfer of the Property to the Buyer is approved pursuant to Sections

44994225 v3

105 and 363(f) of the Bankruptcy Code;

    iii.    Buyer will receive title for the Property free and clear of all Liens pursuant to Section 363(f) of the Bankruptcy Code, with such Liens attaching to the sale proceeds, and otherwise in accordance with the requirements of this Agreement. Without limiting the foregoing general requirements, the Sale Order shall satisfy requirements 4, 6, and 7 of Schedule B-I of the Title Commitment.

    iv.    a provision that the transfer of the Property from Seller to Buyer contemplated by this Agreement shall be exempt from any documentary stamps on the Deed and any mortgage, intangible tax on any mortgage, and any real estate transfer, mortgage reporting, sales, use, or other similar tax, pursuant to Section 1146(a) of the Bankruptcy Code; provided that, alternatively, such provision may be included in an order confirming the Debtor's plan of liquidation.

10.   <u>Acceptance of the Property "As Is"</u>. Buyer acknowledges Buyer was allowed thoroughly to investigate the Property, the title thereto and conditions thereon, and all components thereof before electing to participate in the Auction. In deciding to participate in the Auction and acquire the Property, Buyer has relied on Buyer's investigation of the Property conducted before the Auction.

    a.    Buyer shall have no right or discretion whatsoever to terminate this Agreement because of conditions affecting or information concerning the Property of which Buyer becomes aware after the Effective Date, regardless of the nature of those conditions or information. Further, Seller's performing repairs or replacements to remedy conditions affecting the Property, or otherwise upgrading or improving any component of or condition affecting the Property, is not a condition of Buyer's obligation to purchase the Property. Seller shall have no obligation to perform any such repairs or replacements, or to upgrade or improve any component of or condition affecting the Property. Before Closing, Seller shall maintain and operate the Hotel consistent with past practices.

    b.    NOTWITHSTANDING ANY CONTRARY OR CONFLICTING PROVISION OF THIS AGREEMENT, BUYER SHALL AT CLOSING ACCEPT THE PROPERTY AS IS, WHERE IS, AND SUBJECT TO ALL FAULTS, DEFECTS, AND OTHER CONDITIONS, KNOWN AND UNKNOWN, PATENT AND LATENT. SELLER MAKES NO WARRANTIES OR REPRESENTATIONS RELATING TO THE PROPERTY, ITS CONDITION OR OPERATIONS, THE COST OR FEASIBILITY OF REPAIRING, RESTORING, OR UPGRADING THE PROPERTY, OR OTHER MATTERS EXCEPT THE WARRANTIES AND REPRESENTATIONS THAT ARE EXPRESSLY STATED IN THIS AGREEMENT. SELLER DISCLAIMS ALL OTHER WARRANTIES, REPRESENTATIONS, AND GUARANTIES; AND BUYER AGREES NO OTHER WARRANTIES, REPRESENTATIONS, OR GUARANTIES FROM SELLER SHALL BE IMPLIED. BUYER BEARS ALL RISKS OF DEFECTS, FAULTS, AND OTHER CONDITIONS OF THE PROPERTY. WITHOUT LIMITING THE FOREGOING, BUYER SHALL ACCEPT THE PROPERTY SUBJECT TO CONDITIONS, RESTRICTIONS, REQUIREMENTS, CONSTRAINTS, OBLIGATIONS, AND OTHER MATTERS IMPOSED BY OR ARISING FROM PERMITS, APPROVALS, LICENSES, FRANCHISES, ORDERS, DEVELOPMENT ORDERS, CERTIFICATES, ACCEPTANCES, RESERVATIONS, VARIANCES, SPECIAL EXCEPTIONS, AND OTHER AUTHORIZATIONS AND REQUIREMENTS OF GOVERNMENTAL OR QUASI-GOVERNMENTAL AUTHORITIES.

11. Crowne Plaza; Indemnification.  The Hotel operates as a "Crowne Plaza" pursuant to that certain *Crowne Plaza New Development License Agreement* dated April 12, 1999 (as same may be amended, the "**License Agreement**") between Seller, as licensee, and Holiday Hospitality Franchising, LLC ("**HHF**").  Without limiting any other provision of this Agreement, the Property does not include the License Agreement.  Accordingly, Seller will not transfer or assign to Buyer the License Agreement; and Buyer will not have the right to operate the Hotel under the Crowne Plaza brand unless Buyer independently negotiates a separate license agreement with HHF.

In the event Buyer does not enter into a new license agreement or make other arrangements with HHF that permit Buyer to continue operating the Hotel as a Crowne Plaza hotel or that otherwise address the responsibility for and process of de-identifying the Hotel, Buyer shall immediately after Closing, at Buyer's own expense, take all steps necessary to de-identify the Hotel from the Crown Plaza brand in accordance with the requirements of HHF and of the License Agreement, and Buyer shall not operate the Hotel as a Crowne Plaza hotel after the Closing Date.  Without limiting the foregoing, Buyer shall not be permitted to use any of HHF's trademarks or service marks, shall remove all signage and branding identifying the Hotel as a Crowne Plaza, and shall take all other actions required to preclude any possibility of confusion on the part of the public that the Hotel is no longer operating as a Crowne Plaza hotel.  Buyer shall indemnify Seller and Seller's successors in interest, from any and all claims, causes of action, monetary awards, damages, penalties, fees, including attorneys' fees, and costs incurred by Seller as a result of Buyer's failure to de-identify the Hotel as required in this paragraph. Further, notwithstanding any other provision of this Agreement, Seller and HHF shall have the right as either of them deems necessary to enter onto the Land and remove signage, trade dress, and other identifying features of a Crown Plaza hotel, and for that purpose Seller reserves a right and easement for itself and for HHF to enter onto the Land after Closing.  If Seller or HHF invokes this right, Buyer shall be obligated to reimburse Seller or HHF, as the case may be, all costs actually incurred within fifteen (15) days after receiving a demand therefor.  Buyer shall hold Seller, HHF, and their respective officers, directors, employees, contractors, and other Persons acting on their behalf with respect to any damages, liens, claims, and other obligations and liabilities arising from or relating to the exercise by Seller and HHF of the rights and easements granted by this provision.  This Section and the rights, easements, obligations, and liabilities granted hereby or arising herefrom will survive Closing.

12. Prorations and Adjustments**.** The items of revenue and expense set forth in this Section shall be prorated between the Parties (the "**Prorations**") as of 11:59 p.m. on the day preceding the Closing Date (the "**Cut-Off Time**"), or such other time expressly provided in this Section, so that the Closing Date is a day of income and expense for Buyer.

   a.  Taxes. All Taxes (real and personal property) shall be prorated as of the Cut-Off Time between Seller and Buyer. If the amount of such Taxes is not ascertainable on the Closing Date, the proration for such Taxes shall be based on the most recent available bill.

   b.  Utilities. All utility services shall be prorated as of the Cut-Off Time between Seller and Buyer. The Parties shall use commercially reasonable efforts to obtain readings for all utilities as of the Cut-Off Time. If readings cannot be obtained as of the Closing Date, the cost of such utilities shall be prorated between Seller and Buyer by estimating such cost based on the most recent bill for such service. Seller shall receive a credit for all fuel stored at the Land based on the cost for such fuel. Seller shall receive a credit for all deposits transferred to Buyer or which remain on deposit for the benefit of Buyer with respect to any utility contract.

c. <u>Bookings</u>. Buyer shall receive a credit for all prepaid deposits for Bookings scheduled to occur on or after the Closing Date, except to the extent such deposits are transferred to Buyer. Buyer shall receive a credit in the amount of any vouchers, coupons, or other discounted or free services or accommodations that are scheduled or otherwise available to be made on or after the Closing Date.

d. <u>Retail Merchandise</u>. Seller shall receive a credit for all Retail Merchandise based on Seller's cost for such items.

e. <u>Restaurants and Bars</u>. Seller shall close out the transactions in the restaurants and bars as of the regular closing time for such restaurants and bars during the night in which the Cut-Off Time occurs, and shall retain all monies collected as of such closing time. Buyer shall be entitled to any monies collected from the restaurants and bars thereafter.

f. <u>Vending Machines</u>. Seller shall remove all monies from all vending machines, laundry machines, pay telephones, and other coin-operated equipment as of the Cut-Off Time and shall retain all monies collected therefrom as of the Cut-Off Time. Buyer is entitled to any monies collected therefrom after the Cut-Off Time.

g. <u>Trade Payables</u>. Except to the extent an adjustment or proration is made under another subsection of this Section: (i) Seller shall pay in full prior to the Closing all amounts payable to vendors or other suppliers of goods or services (the "**Trade Payables**") which are due and payable as of the Closing Date for which goods or services have been delivered prior to Closing; and (ii) Buyer shall receive a credit for the amount of such Trade Payables which have accrued, but are not yet due and payable as of the Closing Date, and Buyer shall pay all such Trade Payables when such Trade Payables become due and payable.

h. <u>Cash</u>. Seller shall receive a credit for all cash on hand or on deposit in any house bank which shall remain on deposit for the benefit of Buyer.

i. <u>Accounts Receivable</u>.

    i. <u>Guest Ledger</u>. At Closing, Seller shall receive a credit in an amount equal to: (a) all amounts charged to the Guest Ledger for all room nights up to (but not including) the night during which the Cut-Off Time occurs; and (ii) one-half (1/2) of all amounts charged to the Guest Ledger for the room night which includes the Cut-Off Time (other than any restaurant or bar charges on the Guest Ledger which shall be prorated as provided above; and Buyer shall be entitled to retain all deposits made and amounts collected with respect to such Guest Ledger.

    ii. <u>Accounts Receivable (Other than Guest Ledger)</u>. At Closing, Seller shall receive a credit for all Accounts Receivable that are not more than 90 days overdue (other than the Guest Ledger which is addressed above), and Buyer shall be entitled to all amounts collected for such Accounts Receivable. Seller shall retain all Accounts Receivable that are more than 90 days overdue.

j. <u>Inventories</u>. All Personal Property, including inventories, are included in the Purchase Price.

k. <u>Sales and Use Taxes</u>. Seller shall pay all sales tax, use tax, and hotel accommodation taxes due through the Closing Date.

l. <u>Insurance</u>. Buyer shall not assume any of Seller's existing insurance policies and shall have no obligations in connection therewith.

m. <u>Other Adjustments and Prorations</u>. All other items of income and expense as are customarily adjusted or prorated upon the sale and purchase of a hotel property similar to the Property shall be adjusted and prorated between Seller and Buyer accordingly.

No later than the day prior to Closing, the Parties, through their respective employees, agents, or representatives, jointly shall make such examinations, audits, and inventories of the Hotel as may be necessary to make the adjustments and prorations to the Purchase Price as set forth above in this Section, or any other provisions of this Agreement. Based on such examinations, audits, and inventories, the Parties jointly shall prepare prior to Closing a closing statement (the "**Closing Statement**"), which shall set forth their best estimate of the amounts of the items to be adjusted and prorated under this Agreement. The Closing Statement shall be approved and executed by the Parties at Closing, and such adjustments and prorations shall be final with respect to the items set forth in the Closing Statement.

13. <u>Representations and Warranties of Seller</u>. Seller represents and warrants to Buyer that Seller is the Chapter 11 debtor in possession and that, pursuant to the Bid Procedures Order, and subject to the entry of the Sale Order, and that without any contrary order being obtained by any party in interest, Seller has the power to convey the Property to Buyer pursuant to this Agreement, subject to Bankruptcy Court approval.

14. <u>Representations and Warranties of Buyer</u>. Buyer hereby represents and warrants to Seller, which representations and warranties shall survive Closing, as follows:

a. This Agreement is, and the other documents and instruments contemplated hereby will be, when executed and delivered by Buyer, the valid and binding obligations of Buyer, enforceable against Buyer in accordance with their respective terms.

b. Neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby will result in a violation by Buyer of any federal, state, local or other law or governmental requirement of any kind, and any rules, regulations, permits, licenses and orders promulgated thereunder.

15. <u>Default and Remedies</u>.

a. If the Closing fails to occur because of a default, misrepresentation or breach of warranty by Buyer, Seller shall be entitled to retain the Deposit as Seller's sole remedy at law or in equity for Buyer's failure to close on the purchase of the Property. In any such event, Buyer shall continue to be liable under any provisions of this Agreement that expressly survive the termination of this Agreement.

b. If the Closing fails to occur solely because of a default by Seller under the provisions of this Agreement, the Sale Order, or any other order of the Bankruptcy Court applicable to the sale of the Property hereunder, then Buyer may, as its exclusive remedy (i) receive a return of its Deposit and terminate this Agreement by notice to Seller, plus its actual out of pocket costs and expenses up to fifty thousand dollars ($50,000.00), subject to Buyer providing proof of actual expenses and costs; or (ii) Buyer may seek specific performance of this Agreement, unless such remedy is not authorized under the terms of the Sale Order.

16. <u>Seller's Right to Cure</u>. Notwithstanding any contrary provision of this Agreement, Seller shall not be deemed (a) in default of any covenant or obligation hereunder, (b) to have given a false, incorrect, or misleading representation or warranty hereunder, (c) or otherwise to have violated the terms of this Agreement, (all of the foregoing events of default being referred to in this Section as a "**Default**") unless Buyer first notifies Seller in writing of the Default and Seller fails within thirty (30) days after receipt of that notice to cure the Default (a cure including without limitation, if applicable, effecting the changes necessary to render a warranty or representation correct). If Seller cures the alleged Default within the permitted period, then Seller shall be deemed not to be in default hereof.

17. <u>Casualty Loss; Condemnation</u>.

    a.   <u>Termination</u>. If, prior to Closing, (i) all or any material portion of the Property is subject to a taking by a public authority (a "**Material Taking**"), or (ii) the Property is destroyed or suffers material damage (a "**Material Casualty**"), then Seller shall promptly notify Buyer of such Material Taking or Material Casualty. Buyer shall have the right to terminate this Agreement by written notice given to Seller within ten (10) days after Seller's notification to Buyer of a Material Taking or Material Casualty, as applicable. If Buyer elects to terminate this Agreement as aforesaid, then the Deposit shall be returned to Buyer and Buyer and Seller shall thereafter be relieved of further liability hereunder, except to the extent survival of any obligation or liability is expressly provided herein.

    b.   <u>Non-Termination</u>. In the event that (i) Buyer does not elect to terminate this Agreement pursuant to Section 17(a); or (ii) prior to Closing any non-material portion of the Property is subject to a taking by a public authority (a "**Non-Material Taking**"); or (iii) the Property suffers non-material damage by reason of an event or casualty (a "**Non-Material Casualty**"), the Buyer shall accept the Property in its then condition and proceed with the Closing without any abatement of the Purchase Price whatsoever, in which event, at Closing, all of the insurance proceeds (including, without limitation, any assignable business interruption insurance proceeds payable for losses incurred after Closing, but not before Closing), condemnation award, or right to such proceeds or condemnation award, shall be assigned by Seller to Buyer, and any monies theretofore received by Seller that have not been used by Seller on account of any reasonably necessary repairs or restorations in connection with such damages or other casualty or condemnation shall be paid over to Buyer.

    c.   <u>Notice; Materiality</u>. Seller shall give Buyer prompt notice of any damage to or destruction of the Property or of the institution of any proceedings for condemnation of all or any portion of the Property. For the purposes of this Section, damage to, or the taking of, a portion of the Property shall be deemed to be "material" if the estimated cost of restoration or repair of the damage or diminution of the value of the remaining Property on account of a taking, as the case may be, exceeds Five Million Dollars ($5,000,000.00).

    d.   <u>Survival</u>. The terms of this Section shall survive Closing and the delivery of the Deed.

18. <u>Buyer's Premium</u>. At Closing, in addition to all other amounts Buyer must pay pursuant to this Agreement, Buyer shall pay a commission to Fisher Auction Company, Inc. (the "**Broker/Auctioneer**") equal to three percent (3%) of the Purchase Price ("**Buyer's Premium**"). The Buyer's Premium is to be paid by the Buyer in addition to the Successful Bid amount. Seller

shall not be responsible for any broker's commissions. Buyer shall indemnify and hold the Seller harmless from the claims of any other broker or finder claiming through the Buyer. The provisions of this Section shall survive the Closing and any termination of this Agreement. The 3% Buyer's Premium shall be allocated as set forth in the Bid Procedures Order and the *Order Approving Debtor's Application to Employ HREC Investment Advisors as Real Estate Co-Broker to the Debtor* (Doc. No. 228).

19. <u>Escrow Instructions.</u> This Agreement shall constitute the escrow instructions for Escrow Agent. Escrow Agent will hold and dispose of the Deposit in accordance with the following provisions and with other applicable provisions of this Agreement.

    a. If any dispute arises concerning disposition of the Deposit, Escrow Agent may retain the Deposit until receipt by Escrow Agent of written instructions signed by both Parties directing the manner in which Escrow Agent should dispose of the Deposit. Escrow Agent may at any time, but is not required to, bring an action to interplead the Deposit pending a final determination of the disputants' rights.

    b. Escrow Agent shall incur no liability to any person whomsoever in connection with the Deposit or actions taken or omissions occurring in connection with this Agreement, except liability for Escrow Agent's gross negligence or willful misconduct. Accordingly, Escrow Agent shall not incur any liability with respect to (i) any action taken or omitted in good faith, including upon advice of its legal counsel given with respect to any questions relating to the duties and responsibilities of the Escrow Agent under this Agreement, or (ii) any action taken or omitted in reliance on any instrument, not only as to its due execution and the validity and effectiveness of its provisions, but also as to the truth and accuracy of any information contained therein, which Escrow Agent shall in good faith believe to be genuine, to have been signed or presented by a person or persons having authority to sign or present such instrument, and to conform with the provisions of this Agreement.

    c. Escrow Agent shall have no liability for the failure of any institution in which Escrow Agent deposits the Deposit. The Deposit will not accrue interest while controlled by Escrow Agent.

    d. The Parties, jointly and severally, agree to indemnify, defend, and hold Escrow Agent harmless from all fines, penalties, claims, damages, losses, expenses (including without limitation court costs and attorneys' fees incurred by Escrow Agent before all tribunals), obligations, or liabilities arising in connection with the handling or disposition of the Deposit.

    e. If conflicting demands relating to this Agreement are made upon the Escrow Agent, the Parties hereto expressly agree that the Escrow Agent shall have the absolute right to do either or both of the following: (i) withhold and stop all actions in performance of this escrow and await settlement of the controversy by final appropriate legal proceedings or as otherwise mutually directed in writing by Buyer and Seller; or (ii) file suit in declaratory relief or interpleader and obtain an order from the Bankruptcy Court requiring the parties to interplead and litigate in such court their several claims and rights amongst themselves. Upon the filing of any such declaratory relief or interpleader suit and depositing with the Bankruptcy Court all funds deposited by the parties under this Agreement, the Escrow Agent shall thereupon be fully released and discharged from any and all obligations to further perform the duties or obligations imposed upon it by this Agreement.

20. <u>Notices.</u> All notices, elections and other communications permitted or required in this Agreement ("**Notice**") will be in writing, signed by the Party making the Notice, and will be: (i) delivered personally, or (ii) sent by reputable overnight delivery service or by registered or certified mail, return receipt requested, or (iii) transmitted by facsimile or email (with a copy via one of the other aforesaid means) to the other Party at the addresses provided in this Agreement. The date of Notice will be the date of personal delivery, consignment for overnight delivery, mailing, or email or facsimile transmission, as the case may be, unless otherwise specified herein. Notices delivered by or to the attorney for a Party through one of the methods listed above will be deemed given by or to, as the case may be, the applicable Party.

    a. Notice to Seller will be delivered to: Universal Towers Construction, Inc., Attn. Lis Oliveira-Sommerville, President, 7800 Universal Boulevard, Orlando, Florida 32819; email to: lisrcoliveira@gmail.com.

    b. A copy of any Notice to Seller will be simultaneously delivered to Seller's attorneys Christopher R. Thompson and Eric S. Golden, Burr & Forman, 200 S. Orange Avenue, Suite 800, Orlando, Florida 32801; email to: crthompson@burr.com; egolden@burr.com; telephone at (407) 540-6600.

    c. Notice to Buyer will be delivered to: MAC New Opportunities LLC c/o Monarch Alternative Capital LP, 535 Madison Avenue, New York, New York 10022.

    d. A copy of any Notice to Buyer will be simultaneously delivered to Buyer's attorney: Colin Daniels, General Counsel, Monarch Alternative Capital LP, 535 Madison Avenue, New York, New York 10022.

    e. Notice to Escrow Agent will be delivered to: Fidelity National Title Insurance Company; Attn: Sam Sobering; 921 Arabian Avenue, Winter Springs, Florida 32708; Phone: (321) 228-8510; Sam.Sobering@fnf.com.

21. <u>Successors and Assigns.</u> Buyer will have such rights to assign this Agreement as are granted by the Sale Order, subject to the conditions and requirements of the Sale Order. If the Sale Order is silent concerning Buyer's right to assign this Agreement, Buyer will have no right to assign this Agreement without first receiving Seller's consent to assign, provided that Buyer may assign this Agreement to an affiliate of Buyer.

    a. In the event of Buyer's assignment of this Agreement, Buyer shall remain liable in all respects for performance of, and all obligations and liabilities arising from, this Agreement.

    b. This Agreement shall inure to the benefit of and shall be binding upon the Parties and their respective heirs, personal representatives, successors and assigns.

    c. If either Party consists of more than one person, all such persons shall be jointly and severally liable under this Agreement.

22. <u>Counterparts.</u> This Agreement may be executed in multiple counterparts. The signature of any Party to a counterpart shall be deemed to be the signature to, and may be appended to, any other counterpart. A Party shall be bound by this Agreement by executing a counterpart hereof, then transmitting the executed counterpart to the other Parties via email in .pdf or similar format.

23. <u>Attorneys' Fees.</u> If either Party initiates or is made a Party to legal proceedings (whether judicial, administrative, declaratory, in arbitration, or otherwise) in connection with this Agreement, then the nonprevailing Party in those proceedings will pay the costs and attorney's fees, including the costs and attorney's fees of appellate proceedings, incurred by the prevailing Party.

24. <u>Rules of Construction</u>.

    a. As used in this Agreement: (i) words in the singular shall be held to include the plural and vice versa, (ii) words of one gender shall be held to include the other genders as the context requires, (iii) the terms "hereof", "herein" and "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement and not to any particular provision of this Agreement, (iv) references to Section, paragraph, Exhibit and Schedule are references to the Sections, paragraphs, Exhibits and Schedules of this Agreement, unless otherwise specified, (v) section headings in this Agreement are solely for convenience of reference, and are not intended to be a part of or to affect the meaning or interpretation of this Agreement, (vi) the word "including" and words of similar import when used in this Agreement, shall mean "including, without limitation," unless otherwise specified, and (vii) the word "or" shall not be exclusive.

    b. Each Party and its counsel have reviewed this Agreement. The normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement or of any amendments or exhibits to this Agreement.

    c. Time is of the essence of this Agreement. The time in which any act is to be done under this Agreement is computed by excluding the first day and including the last day, unless the last day is not a Business Day in which case that day is also excluded. Unless otherwise expressly provided for herein to the contrary, time periods of five days of less will be Business Days and time periods of five days or more will be calendar days. "**Business Days**" means all days other than Saturday, Sunday, and federal holidays. Federal holidays will include the day immediately following Thanksgiving Day, the day immediately following Christmas Day, and the day immediately following New Years Day. Each time period shall expire at 5:00 P.M. (Orlando, Florida time) on the last day of the applicable time period.

25. <u>Miscellaneous</u>.

    a. This Agreement may not be amended except by an instrument in writing signed on behalf of each Party.

    b. The Deposit, Purchase Price, and other payments due from Buyer under this Agreement shall be remitted in immediate funds by federal wire transfer in accordance with wire transfer instructions provided by the required recipient, Seller, Escrow Agent, or Closing Agent.

    c. This Agreement, together with the Schedules and other agreements referred to in this Agreement, constitute the entire agreement between the Parties pertaining to the subject matter of this Agreement and supersede all prior and contemporaneous agreements, understandings, negotiations and discussions, whether oral or written, of the Parties regarding such subject matter.

d. Regardless of whether the transactions contemplated by this Agreement are consummated, each Party shall pay its or their own costs and expenses, including Legal Costs and investment banking, accounting, consulting, and other professional fees, incurred in connection with the negotiation, preparation, investigation and performance by such Party of this Agreement and the transactions contemplated under this Agreement, except as otherwise provided for herein.

e. This Agreement shall not be recorded by Buyer. Any attempt to record this Agreement or any memorandum hereof or any reference hereto by Buyer or any agent or representative of Buyer shall, at the sole option of Seller, constitute a material default by Buyer, in which event Escrow Agent shall deliver the Deposit to Seller and Buyer shall execute and deliver such documents, and take such other actions, as Seller may require in order to evidence of record that Buyer has no right, title, claim, or interest in the Property.

f. Notwithstanding any other provision of this Agreement, any representation, warranty, or covenant of Seller contained in this Agreement that by its terms survives Closing or the termination of this Agreement, shall not survive the closing of the Bankruptcy Case.

g. Seller and Buyer will, without additional consideration, sign, acknowledge, and deliver any other documents and take any other action necessary or appropriate and reasonably requested by the other to carry out the intent and purpose of this Agreement.

h. Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that exceed federal and state guidelines have been found in buildings in Florida. Additional information regarding radon and radon testing may be obtained from county public health units.

i. The determination that any covenant, agreement, condition or provision of this Agreement, which is not necessary to the enjoyment by either party of the benefit contemplated herein, is invalid and shall not affect the enforceability of the remaining covenants, agreements, conditions or provisions hereof and, in the event of any such determination, this Agreement shall be construed as if such invalid covenant, agreement, condition or provision were not included herein.

j. No failure or delay of either Party in the exercise of any right given to such Party hereunder shall constitute a waiver thereof unless the time specified herein for exercise of such right has expired, nor shall any single or partial exercise of any right preclude any other or further exercise thereof or of any other right. The waiver of any breach hereunder shall not be deemed to be a waiver of any other or any subsequent breach hereof.

k. Whenever provision is made in this Agreement for one Party to indemnify the other Party with respect to any claim or risk, such provision shall be interpreted to mean that the Party (in this Section "**Indemnitor**") indemnifying the other Party (in this Section "**Other**") agrees to indemnify, defend, and hold harmless the Other from and against any and all fines, penalties, losses, expenses, obligations, claims, suits, actions, damages, or liabilities, including reasonable attorneys' fees, which the Other may incur or to which it may become subject as a result of or in connection with, and to the extent caused by, the described claim or risk.

l. The Parties neither intend to confer any benefit hereunder on any Person other than the parties hereto, nor shall any such third party have any rights hereunder.

m. This Agreement shall be governed by, construed, interpreted and the rights of the Parties determined in accordance with the laws of the State of Florida without reference to its choice or conflicts of laws principles. Each Party: (i) irrevocably submits to the jurisdiction of the Bankruptcy Court; (ii) waives any objection to laying venue in any such action or proceeding in the Bankruptcy Court; (iii) waives any objection that the Bankruptcy Court is an inconvenient forum or does not have jurisdiction over any Party; and (iv) agrees that service of process upon such Party in any such action or proceeding shall be effective if given in accordance with the notice provisions of this Agreement.

n. BUYER AND SELLER HEREBY EACH WAIVE THE RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING BASED UPON, OR RELATED TO, THE SUBJECT MATTER OF THIS AGREEMENT.

o. Buyer acknowledges receipt of the Bid Procedures Order, and represents that it has either had its counsel review and advise Buyer regarding the terms of the Bid Procedures Order, or that Buyer has had the opportunity to have counsel review the Bid Procedures Order. Buyer agrees to be bound by the terms and conditions of the Bid Procedures Order and the Bid Procedures approved thereby. Any omission from this Agreement of any condition, obligation, or requirement contained in the Bid Procedures Order shall not relieve Buyer of such condition, obligation, or requirement. Buyer acknowledges that it is entering into this Agreement, and upon the Closing shall take the Hotel, subject to the terms, conditions, and requirements of the Bid Procedures Order, and the Sale Order.

26. <u>Exhibits</u>. The following Exhibits referenced elsewhere in this Agreement are attached hereto and incorporated herein by reference:

a. **<u>Exhibit "A"</u> -** Description or Depiction of the real property.

[The Parties have signed on the following page.]

**[Signature page to Purchase and Sale Agreement]**

**BUYER:**

MAC New Opportunities LLC, a Delaware
Limited Liability Company, by M Manager
LLC, a Delaware Limited Liability Company

Signature: _Andrew Herenstein_____
DocuSigned by:
E3C8DEC3BFD8428

Print name: Andrew Herenstein
Title: Authorized Person

Date: March 16, 2021

**SELLER:**

UNIVERSAL TOWERS CONSTRUCTION,
INC., a Florida corporation

Signature: _Lis Oliveira-Sommerville_____
DocuSigned by:
8A80FAD350CE457

Print name: Lis Oliveira-Sommerville
Title:  President

Date: _____3/16/2021_____,
2021

Page 20 of 21

**EXHIBIT A**

**LEGAL DESCRIPTION**

Property Described in the land records of Orange County, Florida as:

Lot 2, FLORIDA CENTER, UNIT 16, according to the plat thereof as recorded in Plat Book 5, Pages 141 through 145, Public Records of Orange County, Florida.

Page 21 of 21

# Exhibit B

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

In re:

UNIVERSAL TOWERS CONSTRUCTION,                CASE NO. 6:20-bk-03799-KSJ
INC.,                                          Chapter 11

      Debtor.

_____/

## NOTICE OF FILING

     Debtor, Universal Towers Construction, Inc., by and through its undersigned counsel,

hereby gives notice of filing of the attached Purchase and Sale Agreement between Universal

Towers Construction, Inc. and 7800 Universal Blvd Owner LLC, the designated Back-Up Bidder.


                                    /s/ Christopher R. Thompson
                                    **Eric S. Golden**
                                    Florida Bar No. 146846
                                    Email: egolden@burr.com
                                    **Christopher R. Thompson**
                                    Florida Bar No. 0093102
                                    Email: crthompson@burr.com
                                    **BURR & FORMAN, LLP**
                                    200 S. Orange Ave., Suite 800
                                    Orlando, Florida 32801
                                    Phone: (407) 540-6600
                                    *Attorneys for Debtor*


## CERTIFICATE OF SERVICE

     I HEREBY CERTIFY that on March 17, 2021, I electronically filed the foregoing with the

Clerk of the Court by using the CM/ECF system which will send electronic notice to all parties

registered to receive electronic notice.

                                    /s/ Christopher R. Thompson
                                    Christopher R. Thompson

**THIS AGREEMENT WILL TAKE EFFECT UPON ENTRY OF THE <u>SALE ORDER</u> CONFIRMING THE <u>SUCCESSFUL BID</u>, AND WILL THEN BECOME BINDING ON THE <u>SUCCESSFUL BIDDER</u>. BY SUBMITTING ITS BID AND PARTICIPATING IN THE <u>AUCTION</u>, EACH BIDDER BINDS ITSELF TO, AND BECOMES OBLIGATED TO EXECUTE AND PERFORM UNDER THIS AGREEMENT, IN THE EVENT THE BIDDER SUCCEEDS IN THE <u>AUCTION</u> OR IS DESIGNATED THE <u>BACK-UP BIDDER</u>. UNDERLINED TERMS IN THE FOREGOING STATEMENT ARE DEFINED BELOW IN THE TEXT OF THIS AGREEMENT.**

PURCHASE AND SALE AGREEMENT

BETWEEN

UNIVERSAL TOWERS CONSTRUCTION, INC., a Florida Corporation,
AS CHAPTER 11 DEBTOR IN POSSESSION

as Seller

AND

7800 UNIVERSAL BLVD OWNER LLC, a Delaware Limited Liability Company

as Buyer

Property: 7800 Universal Boulevard

Orlando, Florida 32819

Dated as of: _____, 2021

THIS PURCHASE AND SALE AGREEMENT (this "**Agreement**") is entered into as of the Effective Date (defined below) between UNIVERSAL TOWERS CONSTRUCTION, INC., a Florida Corporation, as debtor in possession (the "**Debtor**" or "**Seller**") and 7800 UNIVERSAL BLVD OWNER LLC, a Delaware Limited Liability Company (the "**Buyer**").  Buyer and Seller are sometimes collectively referred to below as the "**Parties**" and each individually as a "**Party**."

## RECITALS

WHEREAS, Debtor is the owner of the real property located at 7800 Universal Boulevard, Orlando, Florida 32819, together with all improvements thereon and appurtenances thereunto, (the "**Land**") which Land is described on **Exhibit "A"** hereto.

WHEREAS, The Land is improved, and is operated, as a Crowne Plaza hotel containing 400 hotel rooms.  References below to the "**Hotel**" mean the hotel business operated on the Land.

WHEREAS, On July 3, 2020, Debtor filed a voluntary petition for relief under Chapter 11, Title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Middle District of Florida – Orlando Division (the "**Bankruptcy Court**"). The case is pending in the Bankruptcy Court as Case No. 6:20-bk-03799-KSJ (the "**Bankruptcy Case**"). Debtor's bankruptcy estate is referred to herein as the "**Estate**."

WHEREAS, On December 8, 2020, the Bankruptcy Court entered the Bid Procedures Order (as defined below), thereby authorizing the Debtor to sell the Hotel by auction pursuant to the Bid Procedures attached thereto as Exhibit A.

WHEREAS, On March 16, 2021, Debtor conducted the Auction and has designated the Buyer as the [check one]:

☐   The Successful Bidder

☑ The Back-Up Bidder

WHEREAS, Debtor believes that it is in the best interests of the Estate to sell the Property (defined below) to Buyer, and the Buyer wishes to purchase the Property from the Debtor, all subject to the approval of the Bankruptcy Court and as more particularly provided below.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows.

## AGREEMENT

1. <u>Definitions</u>.  In addition to all other defined terms contained in this Agreement, each term listed below shall have the meaning prescribed for that term:

   a. "**Accounts Receivable**" means all amounts which Seller is entitled to receive from the Hotel operations but has not received as of the Closing, including, without limitation, charges for the use or occupancy of any guest, conference, or banquet rooms or other facilities at the Land, any restaurant, bar, or banquet services, or any other goods or services provided by or on behalf of Seller at the Hotel, but expressly excluding all: (a) credit card charges, checks, and other instruments which Seller has submitted for payment as of the Closing; and (b) items of income otherwise prorated pursuant to this Agreement.

b. "**Auction**" means the live online-only auction to be conducted pursuant to that certain Bid Procedures Order and the Bid Procedures.

c. "**Back-Up Bid**" means the next highest and best bid submitted at the Auction after the Successful Bid, in the amount of $35,600,000.00, as determined by the Seller in its sole discretion

d. "**Back-Up Bidder**" means the bidder who the Debtor deems to have submitted the Back-Up Bid.

e. "**Bid Procedures Order**" means that certain *Order (1) Approving Bidding Procedures for the Sale of Debtor's Hotel Property, (2) Scheduling Dates to Conduct Auction and Sale Hearing, (3) Approving the Form and Manner of Notices, (4) Approving the Sale of the Hotel Free and Clear of All Liens, Claims, and Encumbrances and Interests, (5) Approving Assumption and Assignment Procedures, and (6) Granting Related Relief*, which the Bankruptcy Court entered on December 8, 2020 (Doc. No. 208) in the Bankruptcy Case.

f. "**Bid Procedures**" means those certain Bid Procedures approved by the Bankruptcy Court for the sale and auction of the Property pursuant to the Bid Procedures Order.

g. "**Bookings**" means all bookings and reservations for guest, conference, and banquet rooms or other facilities at the Hotel as of the Closing, together with all deposits held by Seller with respect thereto.

h. "**Closing**" shall mean the consummation of the conveyance of the Property (defined below) to Buyer and receipt of the Purchase Price (also defined below) by Seller, and the satisfaction or waiver of all other conditions for closing prescribed by this Agreement.

i. "**Data Room**" means the online data room maintained by Fisher Auction Company, which contains material information with respect to the Property.

j. "**Effective Date**" means the date the Sale Order is entered by the Bankruptcy Court.

k. "**Escrow Agent**" means Fidelity National Title Insurance Company.

l. "**Guest Ledger**" means all charges accrued to the open accounts of any guests or customers at the Hotel as of the Cut-Off Time (as defined below) for the use or occupancy of any guest, conference, or banquet rooms or other facilities at the Hotel, any restaurant, bar, or banquet services, or any other goods or services provided by or on behalf of Seller at the Hotel.

m. "**Lien**" means "any interest in" the Property as used in Section 363(f) of the Bankruptcy Code and includes any lien (including any tax lien or judgment lien), pledge, security interest, mortgage or lis pendens, contracts, options or other rights to acquire any other interest in the Property, but does not include any easements or restrictions of record.

n. "**Person**" means any natural person, corporation, company, partnership, proprietorship, joint venture, association, joint stock company, trust, foundation, fund, institution, society, union, club, or other group organized for any purpose, whether or not incorporated, wherever located and of whatever citizenship, or any receiver, trustee in bankruptcy or

similar official, any liquidating agent for any of the foregoing, any trustee or executor in his capacity as such or any government or agency or political subdivision thereof.

o.  "**Purchase Price**" means either (i) if this Agreement is submitted by the Successful Bidder: the Successful Bid amount plus all costs necessary to cure the Assigned Contracts, as described in paragraph 2.b.ii; or (ii) if this Agreement is submitted by the Back-Up Bidder: the Back-Up Bid Amount plus all costs necessary to cure the Assigned Contracts, as described in paragraph 2.b.ii.  For the purpose of clarity, the Purchase Price does not include the Buyer's Premium (as defined in paragraph 18)

p.  "**Retail Merchandise**" means all merchandise held for sale to guests and customers of the Hotel, or ordered for future sale at the Hotel as of the Closing, including, without limitation, the inventory held for sale in any gift shop, pro shop, or newsstand.

q.  "**Section**" means each provision of this Agreement included under any underlined heading or title.  Each Section shall include all clauses and paragraphs contained between the underlined heading for that Section and the underlined heading of the following Section.

r.  "**Stalking Horse Bid Amount**" means $28,250,000.00, the bid submitted by the Stalking Horse Bidder for the purchase of the Property.

s.  "**Stalking Horse Bidder**" means 7800 Universal Boulevard Orlando Owner, LLC, a Delaware limited liability company.

t.  "**Successful Bid**" means the highest and best bid submitted at the Auction in the amount of $35,700,000.00, as determined by the Seller in its sole discretion.

u.  "**Successful Bidder**" means the bidder at the Auction who is deemed by the Seller to have submitted the Successful Bid.

v.  "**Taxes**" means any federal, state, local, or foreign real property, personal property, sales, use, room, occupancy, ad valorem, or similar taxes, assessments, levies, charges, or fees levied with respect to the Property or to operations thereon, including, without limitation, any interest, penalty, or fine with respect thereto, but expressly excluding any: (a) federal, state, local, or foreign income, capital gain, gross receipts, capital stock, franchise, profits, estate, gift, or generation skipping tax; or (b) transfer, documentary stamps on the deed and any mortgage; intangible tax on any mortgage; recording, or similar tax, levy, charge, or fee incurred with respect to the transaction described in this Agreement; *provided*, that Seller shall request that the Bankruptcy Court include a provision in the Sale Order providing that the transfer of the Property shall be exempt from any documentary stamps on the deed and any mortgage, intangible tax on any mortgage, and any real estate transfer, sales, use, or other similar tax, pursuant to Section 1146(a) of the Bankruptcy Code, as set forth herein.

Any terms not defined in this agreement shall have the meaning as defined in Bid Procedures Order and the Bid Procedures; or 11 U.S.C. § 101.  Defined terms may be used in the singular or the plural.  When used in the singular preceded by "a," "an," or "any," such term shall mean one or more members of the relevant class.  When used in the plural, such term shall mean some or all, as applicable in the context, of the members of the relevant class.

2. <u>Sale and Purchase of Property</u>. Subject to the terms and conditions of this Agreement and to the Sale Order, and subject in all events to the approval of the Bankruptcy Court, on the Closing Date (defined below), Seller shall sell, assign, transfer, convey and deliver, or cause to be sold, assigned, transferred, conveyed and delivered, to Buyer, and Buyer shall purchase and acquire from Seller, Seller's right, title, and interest in the following (collectively, the "**Property**"):

    a.   The Land described in <u>Exhibit "A"</u> and located at 7800 Universal Boulevard, Orlando, Florida 32819, together with all of Seller's right, title, and interest in and to any property rights, easements, rights-of-way, hereditaments, appurtenances, entitlements, development rights, permits, approvals, and rights and profits derived from, related to, or appurtenant to the Land (collectively, the "**Easements and Ownership Rights**", and collectively with the Hotel and the Land, the "**Real Property**").

    b.   All personal property located on or in the Real Property that belongs to Debtor and that is used in operations of the Hotel, other than any property specifically excluded herein (the "**Personal Property**"). The following provisions apply for determining personal property to be transferred to Buyer and, therefore, included in the Property:

        i.   The Property does not include the balance of all cash and securities and other cash equivalent interests held by Seller, or for the benefit of Seller or the Hotel, and deposited, held, or contained in any account, bank, or vault, including, but excluding any deposits expressly addressed in the Section below titled "Prorations and Adjustments".

        ii.   The Data Room includes a Schedule of Seller's rights, claims, and interests as a party to, or otherwise with respect to, service contracts, equipment leases, management agreements, franchises, licenses, and other arrangements and agreements that Seller may assign and Buyer may assume (collectively, "**Operations Agreements**"). At the Sale hearing, Seller shall request Bankruptcy Court authority for the assumption and assignment of all Operations Agreements that Buyer elects prior to the Sale hearing, on a preliminary basis, to assume (the "**Designated Contracts**"); and the Seller or the Bankruptcy Court shall determine any necessary cure costs required to be paid to any counterparty to the Designated Contracts upon assumption and assignment, and any other terms and conditions of assumption and assignment of such Designated Contracts. Not later than seven (7) days before the Closing Date, Buyer will specify in a notice to Seller which of the Designated Contracts the Bankruptcy Court has authorized to be assumed and assigned that Buyer desires to designate as part of the Property to be assigned to Buyer at Closing (the "**Assigned Contracts**"). Buyer shall be responsible to pay all cure costs associated with the assumption and assignment of the Assigned Contracts, and shall provide any proof of adequate assurance of future performance of such Assigned Contracts, and comply with any other requirements, as the Bankruptcy Court may order as a condition to assumption and assignment of such Assigned Contracts. The Assigned Contracts will be included in the Property, and

at Closing, Seller will assign and Buyer will expressly assume the Assigned Contracts. The Property does not include, and before Closing Seller will terminate, or Seller shall be deemed to reject, all other Designated Contracts and Operations Agreements.

    iii.    The Personal Property shall include all furniture, fixtures, and equipment; all supplies; computer hardware; transferable IT systems; food and beverage; inventories; Retail Merchandise; transferable licenses and permits; books and records relating to Hotel operations (including transferable guest data (excluding any private guest data protected by any applicable law), but excluding the corporate books and records of the Seller; bookings; transferable warranties; transferable intangible property (telephone numbers (including all "800" and "888" numbers for the Hotel), Hotel-specific internet domain, website, and related login information and the contents therein, and post office boxes); *provided* that Personal Property shall not include any of the foregoing items that Seller leases or licenses, and further shall not include any such items that are property of the hotel franchise licensor (HHF, as defined below) or the hotel management company, Aimbridge Hospitality, Inc. Seller is not obligated to transfer any of the foregoing items that Seller is prohibited by law or contract from transferring. Seller makes no warranties or representations whatsoever concerning the Personal Property.

3.   <u>Court Approval</u>. The parties' respective obligations to purchase and sell the Property pursuant to this Agreement are subject to: (a) Bankruptcy Court approval after notice and a hearing, and (b) the provisions, requirements, and limitations of the Sale Order (defined below).

4.   <u>Purchase Price</u>. Buyer will pay the Purchase Price to Seller in the following manner:

    a.    Upon submission of its Stalking Horse Bid, or, alternatively, in order to participate in the Auction, Buyer paid a deposit of FIVE HUNDRED THOUSAND AND NO/100 DOLLARS ($500,000.00) (the "**Initial Deposit**"), which is held by the Escrow Agent. On Buyer's becoming the Successful Bidder, the Initial Deposit shall become earnest money security for Buyer's performance of this Agreement and shall constitute a portion of the "Deposit."

    b.    Within 24 hours of becoming the Successful Bidder, Buyer shall deliver to Escrow Agent an additional deposit (the "**Additional Deposit**") the amount of which is the difference between 10% of the Successful Bid amount and the Initial Deposit (such that the sum of the Initial Deposit and the Additional Deposit together equal 10% of the Successful Bid). The Additional Deposit will be wire transferred to Escrow Agent to be held in escrow in accordance with this Agreement.

    c.    References in this Agreement to the "**Deposit**" mean the amount from time to time held by Escrow Agent pursuant to this Agreement. The Deposit will not accrue interest. At Closing, the Deposit will be delivered to Seller and applied toward payment of the Purchase Price due from Buyer.

    d.  At Closing, Buyer will pay to Seller the balance of the Purchase Price (adjusted for prorations and other adjustments required in this Agreement) by wire transfer of immediate funds.

    e.  Buyer will also pay at Closing the closing costs allocated in this Agreement to Buyer and the Buyer's Premium required in the Section below titled "Buyer's Premium".

5.  <u>Time and Place of Closing.</u>  Unless (a) otherwise agreed to by the Seller and Buyer in writing, or (b) a stay is imposed by a court of competent jurisdiction, or (c) the Buyer under this Agreement is the Back-Up Bidder, the Closing shall occur not earlier than forty-five (45) calendar days after entry of the Sale Order, or at such other time as may be ordered by the Bankruptcy Court (the "**Closing Date**"). Notwithstanding any provisions to the contrary contained herein, so long as Buyer is not in default hereunder or has otherwise not caused delay of Closing, if Closing has not occurred within ninety (90) days after entry of the Sale Order, then Buyer shall have the option to terminate this Agreement and receive back its Deposit, whereupon the Parties shall be released from any further obligations hereunder except for those that survive Closing. If Buyer invokes this option to terminate, then Seller shall have the right in its discretion to cause Closing to occur within thirty (30) days after receiving notice of Buyer's election to terminate, in which event Buyer shall be obligated to close notwithstanding its previous election to terminate. If the Buyer under this Agreement is the Back-Up Bidder, then the Closing Date shall occur forty-five (45) days after Seller notifies the Back-Up Bidder that the Successful Bidder has failed to close on the purchase of the Property, or at such other time as Seller and Buyer may agree.  With respect to a Back-Up Bidder, this Agreement shall be deemed terminated, and the parties hereto shall be released from any and all obligations and liabilities hereunder, upon the Closing of the sale of the Property to the Successful Bidder.

    a.  Closing will occur at the offices of Seller's legal counsel, Burr & Forman (the "**Closing Agent**"), 200 S. Orange Avenue, 8th floor, Orlando, Florida 32801.  The Closing shall be an escrow closing through the Closing Agent.

    b.  Notwithstanding any other provision of this Agreement, time is of the essence with respect to the Closing Date.  No grace period, notice, or tender shall be required as a condition to declaring Buyer in immediate default for failure to timely to close.

    c.  Buyer acknowledges receipt of a commitment for an ALTA owner's title insurance policy from Fidelity National Title Insurance Company (the "**Title Company**"), with an effective date of December 3, 2020, Order No. 9071222 (the "**Title Commitment**"), together with copies of all documents referenced therein.  At Buyer's request and at Buyer's expense, at Closing, Closing Agent will issue owner's and lender's title insurance policies at the promulgated rate applicable thereto, reduced by a full "Butler Rebate."

        i.  For purposes of this Agreement, the "**Permitted Exceptions**" include those exceptions described in, and other title matters disclosed in, the Title Commitment, together with: (i) taxes for the year of Closing and subsequent years (Seller shall pay taxes for previous years); (ii) all matters appearing on the Survey; and (iii) other matters affecting the Property and disclosed by this Agreement.  Buyer accepts title for the Property subject to the Permitted Exceptions.

       ii.  If Buyer requests issuance of owner's or lender's title insurance policy, not later than five (5) days before Closing, Seller will provide to Buyer an updated Title

Commitment bringing the effective date of the Title Commitment forward.  If that updated Title Commitment reflects that title for the Property has since the previous effective date become subject to an adverse claim, defect, or other condition that is not a Permitted Exception (collectively, "**Subsequent Defects**"), unless Seller removes the Subsequent Defect such that the Title Company agrees to make no exception for it in the title insurance policy, Buyer will have the right in Buyer's discretion to terminate this Agreement by delivering written notice of termination to Seller before the Closing Date, in which event Escrow Agent shall return the Deposit to Buyer and the Parties shall be released from any further obligations under this Agreement, except for those that expressly survive termination of this Agreement.  If Buyer fails before the Closing Date to deliver its notice of termination pursuant to this Section, Buyer shall be deemed to have waived the Subsequent Defects and elected to purchase the Property subject to them (and those Subsequent Defects shall become Permitted Exceptions).

d. If the Bankruptcy Court does not discharge or remove from the title for the Real Property any monetary lien, mortgage, judgment, or other encumbrance securing payment for a liquidated sum (a "**Monetary Lien**"), then Seller may elect at or before Closing to satisfy or otherwise remove that Monetary Lien from title for the Real Property. If Seller fails or elects not to remove a Monetary Lien, the Buyer shall have the right before Closing to terminate this Agreement and receive back the Deposit.

e. Buyer has reviewed and approved the Survey prepared by Associated Land Surveying & Mapping, Inc. dated January 15, 2021, bearing Job No. 20140 (the "**Survey**").

6. <u>Conveyance of Property</u>.  Subject to and in accordance with the provisions of this Agreement and the Sale Order, and subject to approval of the Bankruptcy Court, at Closing Seller shall execute and deliver to Buyer the following instruments for the purpose of transferring and conveying the Property to Buyer:

a. Debtor's Quitclaim Deed (the "**Deed**") conveying the Real Property free and clear of all Liens in accordance with sections 363(b) and (f) of the Bankruptcy Code, with such Liens to attach to the proceeds of sale, but otherwise subject to the Permitted Exceptions.

b. A general bill of sale and assignment conveying to Buyer all of the Personal Property, tangible and intangible, included in the Property (as specified in Section 2(b)), without warranty or representation whatsoever, except that the transfer shall be made subject only to such liens and encumbrances as are permitted by the Bankruptcy Court pursuant to the Sale Order.

c. The Closing Statement (defined below).

d. Assignment of Developer Rights, Permits, Agreements, Approvals, Fees and Deposits, provided that such Assignment shall be without any representations or warranties by the Seller whatsoever.

e. Keys to the improvements located on the Property.

f. Such other documents as may be customary, or as may be authorized or directed in the Sale Order, and documents reasonably required in order to perform this Agreement or to satisfy

reasonable legal concerns. Each closing document shall be consistent with and implement applicable provisions of this Agreement and with the Sale Order.

7. <u>Buyer's Documents</u>. Subject to and in accordance with the provisions of this Agreement and the Sale Order, and subject to approval of the Bankruptcy Court, at Closing Buyer shall execute and deliver the following instruments:

    a. The Closing Statement.

    b. Such other documents as may be customary, or as may be authorized or directed in the Sale Order, and documents reasonably required in order to perform this Agreement or to satisfy reasonable legal concerns. Each closing document shall be consistent with and implement applicable provisions of this Agreement and with the Sale Order.

8. <u>Closing Expenses.</u> Buyer will pay all costs of the Closing, and of transfer and conveyance of the Property, including without implied limitation documentary stamps required to be affixed to the deed, the cost of recording all instruments required to be recorded, the title insurance premiums and charges for related title services, costs and fees of the Closing Agent for closing services (up to, but not exceeding, $1,000.00), the fees and expenses of the Escrow Agent (up to, but not exceeding, $1,000.00), and the costs and fees for Buyer's own attorneys, accountants, and consultants; *provided*, that Seller shall request that the Bankruptcy Court include a provision in the Sale Order providing that the transfer of the Property shall be exempt from any documentary stamps on the deed and any mortgage; intangible tax on any mortgage; and any real estate transfer, mortgage recording, sales, use, or other similar tax, pursuant to Section 1146(a) of the Bankruptcy Code, as set forth herein. Buyer shall receive the maximum "Butler Rebate" on title insurance premiums charged to Buyer.

9. <u>Bankruptcy Court Approval</u>. Buyer's obligation to purchase, and Seller's obligation to sell, the Property are expressly contingent on and subject to the final entry by the Bankruptcy Court of the Sale Order (defined below in this Section) conforming to the requirements of this Agreement.

    a. If on or before April 30, 2021, the Bankruptcy Court has not entered the Sale Order conforming to the requirements of this Agreement, then either of Seller or Buyer may terminate this Agreement by delivering written notice to the other of the election to terminate. In the event of such a termination, Escrow Agent will return the Deposit to Buyer.

    b. Notwithstanding the foregoing, the appointment of a Chapter 11 trustee, or the conversion or dismissal of the Bankruptcy Case, shall NOT relieve the Buyer of its duties under this Agreement, absent further order of the Bankruptcy Court.

    c. Seller shall use commercially reasonable efforts to obtain Bankruptcy Court approval of the sale of the Property to the Buyer in accordance with this Agreement, and such order shall contain the following provisions (the "**Sale Order**"):

        i. a finding that Seller prepared and mailed a motion requesting entry of the Sale Order, and such motion and notice were proper and sufficient as to all parties entitled to it;

        ii. the sale and transfer of the Property to the Buyer is approved pursuant to Sections

DocuSign Envelope ID: 55FCE3B8-C281-4E78-B382-937EC90DB86F

105 and 363(f) of the Bankruptcy Code;

    iii.   Buyer will receive title for the Property free and clear of all Liens pursuant to Section 363(f) of the Bankruptcy Code, with such Liens attaching to the sale proceeds, and otherwise in accordance with the requirements of this Agreement. Without limiting the foregoing general requirements, the Sale Order shall satisfy requirements 4, 6, and 7 of Schedule B-I of the Title Commitment.

    iv.   a provision that the transfer of the Property from Seller to Buyer contemplated by this Agreement shall be exempt from any documentary stamps on the Deed and any mortgage, intangible tax on any mortgage, and any real estate transfer, mortgage reporting, sales, use, or other similar tax, pursuant to Section 1146(a) of the Bankruptcy Code; provided that, alternatively, such provision may be included in an order confirming the Debtor's plan of liquidation.

10.  <u>Acceptance of the Property "As Is"</u>.  Buyer acknowledges Buyer was allowed thoroughly to investigate the Property, the title thereto and conditions thereon, and all components thereof before electing to participate in the Auction.  In deciding to participate in the Auction and acquire the Property, Buyer has relied on Buyer's investigation of the Property conducted before the Auction.

    a.   Buyer shall have no right or discretion whatsoever to terminate this Agreement because of conditions affecting or information concerning the Property of which Buyer becomes aware after the Effective Date, regardless of the nature of those conditions or information. Further, Seller's performing repairs or replacements to remedy conditions affecting the Property, or otherwise upgrading or improving any component of or condition affecting the Property, is not a condition of Buyer's obligation to purchase the Property.  Seller shall have no obligation to perform any such repairs or replacements, or to upgrade or improve any component of or condition affecting the Property. Before Closing, Seller shall maintain and operate the Hotel consistent with past practices.

    b.   NOTWITHSTANDING ANY CONTRARY OR CONFLICTING PROVISION OF THIS AGREEMENT, BUYER SHALL AT CLOSING ACCEPT THE PROPERTY AS IS, WHERE IS, AND SUBJECT TO ALL FAULTS, DEFECTS, AND OTHER CONDITIONS, KNOWN AND UNKNOWN, PATENT AND LATENT. SELLER MAKES NO WARRANTIES OR REPRESENTATIONS RELATING TO THE PROPERTY, ITS CONDITION OR OPERATIONS, THE COST OR FEASIBILITY OF REPAIRING, RESTORING, OR UPGRADING THE PROPERTY, OR OTHER MATTERS EXCEPT THE WARRANTIES AND REPRESENTATIONS THAT ARE EXPRESSLY STATED IN THIS AGREEMENT. SELLER DISCLAIMS ALL OTHER WARRANTIES, REPRESENTATIONS, AND GUARANTIES; AND BUYER AGREES NO OTHER WARRANTIES, REPRESENTATIONS, OR GUARANTIES FROM SELLER SHALL BE IMPLIED. BUYER BEARS ALL RISKS OF DEFECTS, FAULTS, AND OTHER CONDITIONS OF THE PROPERTY.  WITHOUT LIMITING THE FOREGOING, BUYER SHALL ACCEPT THE PROPERTY SUBJECT TO CONDITIONS, RESTRICTIONS, REQUIREMENTS, CONSTRAINTS, OBLIGATIONS, AND OTHER MATTERS IMPOSED BY OR ARISING FROM PERMITS, APPROVALS, LICENSES, FRANCHISES, ORDERS, DEVELOPMENT ORDERS, CERTIFICATES, ACCEPTANCES, RESERVATIONS, VARIANCES, SPECIAL EXCEPTIONS, AND OTHER AUTHORIZATIONS AND REQUIREMENTS OF GOVERNMENTAL OR QUASI-GOVERNMENTAL AUTHORITIES.

11. <u>Crowne Plaza; Indemnification</u>. The Hotel operates as a "Crowne Plaza" pursuant to that certain *Crowne Plaza New Development License Agreement* dated April 12, 1999 (as same may be amended, the "**License Agreement**") between Seller, as licensee, and Holiday Hospitality Franchising, LLC ("**HHF**"). Without limiting any other provision of this Agreement, the Property does not include the License Agreement. Accordingly, Seller will not transfer or assign to Buyer the License Agreement; and Buyer will not have the right to operate the Hotel under the Crowne Plaza brand unless Buyer independently negotiates a separate license agreement with HHF.

In the event Buyer does not enter into a new license agreement or make other arrangements with HHF that permit Buyer to continue operating the Hotel as a Crowne Plaza hotel or that otherwise address the responsibility for and process of de-identifying the Hotel, Buyer shall immediately after Closing, at Buyer's own expense, take all steps necessary to de-identify the Hotel from the Crown Plaza brand in accordance with the requirements of HHF and of the License Agreement, and Buyer shall not operate the Hotel as a Crowne Plaza hotel after the Closing Date. Without limiting the foregoing, Buyer shall not be permitted to use any of HHF's trademarks or service marks, shall remove all signage and branding identifying the Hotel as a Crowne Plaza, and shall take all other actions required to preclude any possibility of confusion on the part of the public that the Hotel is no longer operating as a Crowne Plaza hotel. Buyer shall indemnify Seller and Seller's successors in interest, from any and all claims, causes of action, monetary awards, damages, penalties, fees, including attorneys' fees, and costs incurred by Seller as a result of Buyer's failure to de-identify the Hotel as required in this paragraph. Further, notwithstanding any other provision of this Agreement, Seller and HHF shall have the right as either of them deems necessary to enter onto the Land and remove signage, trade dress, and other identifying features of a Crown Plaza hotel, and for that purpose Seller reserves a right and easement for itself and for HHF to enter onto the Land after Closing. If Seller or HHF invokes this right, Buyer shall be obligated to reimburse Seller or HHF, as the case may be, all costs actually incurred within fifteen (15) days after receiving a demand therefor. Buyer shall hold Seller, HHF, and their respective officers, directors, employees, contractors, and other Persons acting on their behalf with respect to any damages, liens, claims, and other obligations and liabilities arising from or relating to the exercise by Seller and HHF of the rights and easements granted by this provision. This Section and the rights, easements, obligations, and liabilities granted hereby or arising herefrom will survive Closing.

12. <u>Prorations and Adjustments</u>**.** The items of revenue and expense set forth in this Section shall be prorated between the Parties (the "**Prorations**") as of 11:59 p.m. on the day preceding the Closing Date (the "**Cut-Off Time**"), or such other time expressly provided in this Section, so that the Closing Date is a day of income and expense for Buyer.

    a.   <u>Taxes</u>. All Taxes (real and personal property) shall be prorated as of the Cut-Off Time between Seller and Buyer. If the amount of such Taxes is not ascertainable on the Closing Date, the proration for such Taxes shall be based on the most recent available bill.

    b.   <u>Utilities</u>. All utility services shall be prorated as of the Cut-Off Time between Seller and Buyer. The Parties shall use commercially reasonable efforts to obtain readings for all utilities as of the Cut-Off Time. If readings cannot be obtained as of the Closing Date, the cost of such utilities shall be prorated between Seller and Buyer by estimating such cost based on the most recent bill for such service. Seller shall receive a credit for all fuel stored at the Land based on the cost for such fuel. Seller shall receive a credit for all deposits transferred to Buyer or which remain on deposit for the benefit of Buyer with respect to any utility contract.

DocuSign Envelope ID: 55FCE3B8-C281-4E78-8382-937EC90D886F

c.   <u>Bookings</u>. Buyer shall receive a credit for all prepaid deposits for Bookings scheduled to occur on or after the Closing Date, except to the extent such deposits are transferred to Buyer. Buyer shall receive a credit in the amount of any vouchers, coupons, or other discounted or free services or accommodations that are scheduled or otherwise available to be made on or after the Closing Date.

d.   <u>Retail Merchandise</u>. Seller shall receive a credit for all Retail Merchandise based on Seller's cost for such items.

e.   <u>Restaurants and Bars</u>. Seller shall close out the transactions in the restaurants and bars as of the regular closing time for such restaurants and bars during the night in which the Cut-Off Time occurs, and shall retain all monies collected as of such closing time.  Buyer shall be entitled to any monies collected from the restaurants and bars thereafter.

f.   <u>Vending Machines</u>. Seller shall remove all monies from all vending machines, laundry machines, pay telephones, and other coin-operated equipment as of the Cut-Off Time and shall retain all monies collected therefrom as of the Cut-Off Time.  Buyer shall be entitled to any monies collected therefrom after the Cut-Off Time.

g.   <u>Trade Payables</u>. Except to the extent an adjustment or proration is made under another subsection of this Section: (i) Seller shall pay in full prior to the Closing all amounts payable to vendors or other suppliers of goods or services (the "**Trade Payables**") which are due and payable as of the Closing Date for which goods or services have been delivered prior to Closing; and (ii) Buyer shall receive a credit for the amount of such Trade Payables which have accrued, but are not yet due and payable as of the Closing Date, and Buyer shall pay all such Trade Payables when such Trade Payables become due and payable.

h.   <u>Cash</u>. Seller shall receive a credit for all cash on hand or on deposit in any house bank which shall remain on deposit for the benefit of Buyer.

i.   <u>Accounts Receivable</u>.

   i.   <u>Guest Ledger</u>. At Closing, Seller shall receive a credit in an amount equal to: (a) all amounts charged to the Guest Ledger for all room nights up to (but not including) the night during which the Cut-Off Time occurs; and (ii) one-half (1/2) of all amounts charged to the Guest Ledger for the room night which includes the Cut-Off Time (other than any restaurant or bar charges on the Guest Ledger which shall be prorated as provided above; and Buyer shall be entitled to retain all deposits made and amounts collected with respect to such Guest Ledger.

   ii.  <u>Accounts Receivable (Other than Guest Ledger)</u>. At Closing, Seller shall receive a credit for all Accounts Receivable that are not more than 90 days overdue (other than the Guest Ledger which is addressed above), and Buyer shall be entitled to all amounts collected for such Accounts Receivable.  Seller shall retain all Accounts Receivable that are more than 90 days overdue.

j.   <u>Inventories</u>.  All Personal Property, including inventories, are included in the Purchase Price.

k.   <u>Sales and Use Taxes</u>.  Seller shall pay all sales tax, use tax, and hotel accommodation taxes due through the Closing Date.

44994225 v3

l.  <u>Insurance</u>. Buyer shall not assume any of Seller's existing insurance policies and shall have no obligations in connection therewith.

m.  <u>Other Adjustments and Prorations</u>. All other items of income and expense as are customarily adjusted or prorated upon the sale and purchase of a hotel property similar to the Property shall be adjusted and prorated between Seller and Buyer accordingly.

No later than the day prior to Closing, the Parties, through their respective employees, agents, or representatives, jointly shall make such examinations, audits, and inventories of the Hotel as may be necessary to make the adjustments and prorations to the Purchase Price as set forth above in this Section, or any other provisions of this Agreement. Based on such examinations, audits, and inventories, the Parties jointly shall prepare prior to Closing a closing statement (the "**Closing Statement**"), which shall set forth their best estimate of the amounts of the items to be adjusted and prorated under this Agreement. The Closing Statement shall be approved and executed by the Parties at Closing, and such adjustments and prorations shall be final with respect to the items set forth in the Closing Statement.

13. <u>Representations and Warranties of Seller</u>. Seller represents and warrants to Buyer that Seller is the Chapter 11 debtor in possession and that, pursuant to the Bid Procedures Order, and subject to the entry of the Sale Order, and that without any contrary order being obtained by any party in interest, Seller has the power to convey the Property to Buyer pursuant to this Agreement, subject to Bankruptcy Court approval.

14. <u>Representations and Warranties of Buyer</u>. Buyer hereby represents and warrants to Seller, which representations and warranties shall survive Closing, as follows:

a.  This Agreement is, and the other documents and instruments contemplated hereby will be, when executed and delivered by Buyer, the valid and binding obligations of Buyer, enforceable against Buyer in accordance with their respective terms.

b.  Neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby will result in a violation by Buyer of any federal, state, local or other law or governmental requirement of any kind, and any rules, regulations, permits, licenses and orders promulgated thereunder.

15. <u>Default and Remedies</u>.

a.  If the Closing fails to occur because of a default, misrepresentation or breach of warranty by Buyer, Seller shall be entitled to retain the Deposit as Seller's sole remedy at law or in equity for Buyer's failure to close on the purchase of the Property. In any such event, Buyer shall continue to be liable under any provisions of this Agreement that expressly survive the termination of this Agreement.

b.  If the Closing fails to occur solely because of a default by Seller under the provisions of this Agreement, the Sale Order, or any other order of the Bankruptcy Court applicable to the sale of the Property hereunder, then Buyer may, as its exclusive remedy (i) receive a return of its Deposit and terminate this Agreement by notice to Seller, plus its actual out of pocket costs and expenses up to fifty thousand dollars ($50,000.00), subject to Buyer providing proof of actual expenses and costs; or (ii) Buyer may seek specific performance of this Agreement, unless such remedy is not authorized under the terms of the Sale Order.

16. Seller's Right to Cure. Notwithstanding any contrary provision of this Agreement, Seller shall not be deemed (a) in default of any covenant or obligation hereunder, (b) to have given a false, incorrect, or misleading representation or warranty hereunder, (c) or otherwise to have violated the terms of this Agreement, (all of the foregoing events of default being referred to in this Section as a "**Default**") unless Buyer first notifies Seller in writing of the Default and Seller fails within thirty (30) days after receipt of that notice to cure the Default (a cure including without limitation, if applicable, effecting the changes necessary to render a warranty or representation correct). If Seller cures the alleged Default within the permitted period, then Seller shall be deemed not to be in default hereof.

17. Casualty Loss; Condemnation.

    a.   Termination.  If, prior to Closing, (i) all or any material portion of the Property is subject to a taking by a public authority (a "**Material Taking**"), or (ii) the Property is destroyed or suffers material damage (a "**Material Casualty**"), then Seller shall promptly notify Buyer of such Material Taking or Material Casualty.  Buyer shall have the right to terminate this Agreement by written notice given to Seller within ten (10) days after Seller's notification to Buyer of a Material Taking or Material Casualty, as applicable.  If Buyer elects to terminate this Agreement as aforesaid, then the Deposit shall be returned to Buyer and Buyer and Seller shall thereafter be relieved of further liability hereunder, except to the extent survival of any obligation or liability is expressly provided herein.

    b.   Non-Termination.  In the event that (i) Buyer does not elect to terminate this Agreement pursuant to Section 17(a); or (ii) prior to Closing any non-material portion of the Property is subject to a taking by a public authority (a "**Non-Material Taking**"); or (iii) the Property suffers non-material damage by reason of an event or casualty (a "**Non-Material Casualty**"), the Buyer shall accept the Property in its then condition and proceed with the Closing without any abatement of the Purchase Price whatsoever, in which event, at Closing, all of the insurance proceeds (including, without limitation, any assignable business interruption insurance proceeds payable for losses incurred after Closing, but not before Closing), condemnation award, or right to such proceeds or condemnation award, shall be assigned by Seller to Buyer, and any monies theretofore received by Seller that have not been used by Seller on account of any reasonably necessary repairs or restorations in connection with such damages or other casualty or condemnation shall be paid over to Buyer.

    c.   Notice; Materiality.  Seller shall give Buyer prompt notice of any damage to or destruction of the Property or of the institution of any proceedings for condemnation of all or any portion of the Property.  For the purposes of this Section, damage to, or the taking of, a portion of the Property shall be deemed to be "material" if the estimated cost of restoration or repair of the damage or diminution of the value of the remaining Property on account of a taking, as the case may be, exceeds Five Million Dollars ($5,000,000.00).

    d.   Survival.  The terms of this Section shall survive Closing and the delivery of the Deed.

18. Buyer's Premium. At Closing, in addition to all other amounts Buyer must pay pursuant to this Agreement, Buyer shall pay a commission to Fisher Auction Company, Inc. (the "**Broker/Auctioneer**") equal to three percent (3%) of the Purchase Price ("**Buyer's Premium**"). The Buyer's Premium is to be paid by the Buyer in addition to the Successful Bid amount. Seller

shall not be responsible for any broker's commissions. Buyer shall indemnify and hold the Seller harmless from the claims of any other broker or finder claiming through the Buyer. The provisions of this Section shall survive the Closing and any termination of this Agreement. The 3% Buyer's Premium shall be allocated as set forth in the Bid Procedures Order and the *Order Approving Debtor's Application to Employ HREC Investment Advisors as Real Estate Co-Broker to the Debtor* (Doc. No. 228).

19. <u>Escrow Instructions.</u>  This Agreement shall constitute the escrow instructions for Escrow Agent. Escrow Agent will hold and dispose of the Deposit in accordance with the following provisions and with other applicable provisions of this Agreement.

    a.  If any dispute arises concerning disposition of the Deposit, Escrow Agent may retain the Deposit until receipt by Escrow Agent of written instructions signed by both Parties directing the manner in which Escrow Agent should dispose of the Deposit. Escrow Agent may at any time, but is not required to, bring an action to interplead the Deposit pending a final determination of the disputants' rights.

    b.  Escrow Agent shall incur no liability to any person whomsoever in connection with the Deposit or actions taken or omissions occurring in connection with this Agreement, except liability for Escrow Agent's gross negligence or willful misconduct. Accordingly, Escrow Agent shall not incur any liability with respect to (i) any action taken or omitted in good faith, including upon advice of its legal counsel given with respect to any questions relating to the duties and responsibilities of the Escrow Agent under this Agreement, or (ii) any action taken or omitted in reliance on any instrument, not only as to its due execution and the validity and effectiveness of its provisions, but also as to the truth and accuracy of any information contained therein, which Escrow Agent shall in good faith believe to be genuine, to have been signed or presented by a person or persons having authority to sign or present such instrument, and to conform with the provisions of this Agreement.

    c.  Escrow Agent shall have no liability for the failure of any institution in which Escrow Agent deposits the Deposit. The Deposit will not accrue interest while controlled by Escrow Agent.

    d.  The Parties, jointly and severally, agree to indemnify, defend, and hold Escrow Agent harmless from all fines, penalties, claims, damages, losses, expenses (including without limitation court costs and attorneys' fees incurred by Escrow Agent before all tribunals), obligations, or liabilities arising in connection with the handling or disposition of the Deposit.

    e.  If conflicting demands relating to this Agreement are made upon the Escrow Agent, the Parties hereto expressly agree that the Escrow Agent shall have the absolute right to do either or both of the following: (i) withhold and stop all actions in performance of this escrow and await settlement of the controversy by final appropriate legal proceedings or as otherwise mutually directed in writing by Buyer and Seller; or (ii) file suit in declaratory relief or interpleader and obtain an order from the Bankruptcy Court requiring the parties to interplead and litigate in such court their several claims and rights amongst themselves. Upon the filing of any such declaratory relief or interpleader suit and depositing with the Bankruptcy Court all funds deposited by the parties under this Agreement, the Escrow Agent shall thereupon be fully released and discharged from any and all obligations to further perform the duties or obligations imposed upon it by this Agreement.

DocuSign Envelope ID: 55FCE3B8-C281-4E72-8382-93E5C90DB86F

20. <u>Notices.</u> All notices, elections and other communications permitted or required in this Agreement ("**Notice**") will be in writing, signed by the Party making the Notice, and will be: (i) delivered personally, or (ii) sent by reputable overnight delivery service or by registered or certified mail, return receipt requested, or (iii) transmitted by facsimile or email (with a copy via one of the other aforesaid means) to the other Party at the addresses provided in this Agreement. The date of Notice will be the date of personal delivery, consignment for overnight delivery, mailing, or email or facsimile transmission, as the case may be, unless otherwise specified herein. Notices delivered by or to the attorney for a Party through one of the methods listed above will be deemed given by or to, as the case may be, the applicable Party.

 a. Notice to Seller will be delivered to: Universal Towers Construction, Inc., Attn. Lis Oliveira-Sommerville, President, 7800 Universal Boulevard, Orlando, Florida 32819; email to: lisrcoliveira@gmail.com.

 b. A copy of any Notice to Seller will be simultaneously delivered to Seller's attorneys Christopher R. Thompson and Eric S. Golden, Burr & Forman, 200 S. Orange Avenue, Suite 800, Orlando, Florida 32801; email to: crthompson@burr.com; egolden@burr.com; telephone at (407) 540-6600.

 c. Notice to Buyer will be delivered to: 7800 Universal Blvd Owner LLC c/o Tishman Realty, 100 Park Avenue, 18th Floor, New York, New York 10017.

 d. A copy of any Notice to Buyer will be simultaneously delivered to Buyer's attorney: Jennifer Nellany, Tishman Realty, 100 Park Avenue, 18th Floor, New York, New York 10017.

 e. Notice to Escrow Agent will be delivered to: Fidelity National Title Insurance Company; Attn: Sam Sobering; 921 Arabian Avenue, Winter Springs, Florida 32708; Phone: (321) 228-8510; Sam.Sobering@fnf.com.

21. <u>Successors and Assigns.</u> Buyer will have such rights to assign this Agreement as are granted by the Sale Order, subject to the conditions and requirements of the Sale Order. If the Sale Order is silent concerning Buyer's right to assign this Agreement, Buyer will have no right to assign this Agreement without first receiving Seller's consent to assign, provided that Buyer may assign this Agreement to an affiliate of Buyer.

 a. In the event of Buyer's assignment of this Agreement, Buyer shall remain liable in all respects for performance of, and all obligations and liabilities arising from, this Agreement.

 b. This Agreement shall inure to the benefit of and shall be binding upon the Parties and their respective heirs, personal representatives, successors and assigns.

 c. If either Party consists of more than one person, all such persons shall be jointly and severally liable under this Agreement.

22. <u>Counterparts.</u> This Agreement may be executed in multiple counterparts. The signature of any Party to a counterpart shall be deemed to be the signature to, and may be appended to, any other counterpart. A Party shall be bound by this Agreement by executing a counterpart hereof, then transmitting the executed counterpart to the other Parties via email in .pdf or similar format.

23. <u>Attorneys' Fees.</u>  If either Party initiates or is made a Party to legal proceedings (whether judicial, administrative, declaratory, in arbitration, or otherwise) in connection with this Agreement, then the nonprevailing Party in those proceedings will pay the costs and attorney's fees, including the costs and attorney's fees of appellate proceedings, incurred by the prevailing Party.

24. <u>Rules of Construction</u>.

   a. As used in this Agreement: (i) words in the singular shall be held to include the plural and vice versa, (ii) words of one gender shall be held to include the other genders as the context requires, (iii) the terms "hereof", "herein" and "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement and not to any particular provision of this Agreement, (iv) references to Section, paragraph, Exhibit and Schedule are references to the Sections, paragraphs, Exhibits and Schedules of this Agreement, unless otherwise specified, (v) section headings in this Agreement are solely for convenience of reference, and are not intended to be a part of or to affect the meaning or interpretation of this Agreement, (vi) the word "including" and words of similar import when used in this Agreement, shall mean "including, without limitation," unless otherwise specified, and (vii) the word "or" shall not be exclusive.

   b. Each Party and its counsel have reviewed this Agreement. The normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement or of any amendments or exhibits to this Agreement.

   c. Time is of the essence of this Agreement. The time in which any act is to be done under this Agreement is computed by excluding the first day and including the last day, unless the last day is not a Business Day in which case that day is also excluded.  Unless otherwise expressly provided for herein to the contrary, time periods of five days of less will be Business Days and time periods of five days or more will be calendar days.  "**Business Days**" means all days other than Saturday, Sunday, and federal holidays. Federal holidays will include the day immediately following Thanksgiving Day, the day immediately following Christmas Day, and the day immediately following New Years Day.  Each time period shall expire at 5:00 P.M. (Orlando, Florida time) on the last day of the applicable time period.

25. <u>Miscellaneous</u>.

   a. This Agreement may not be amended except by an instrument in writing signed on behalf of each Party.

   b. The Deposit, Purchase Price, and other payments due from Buyer under this Agreement shall be remitted in immediate funds by federal wire transfer in accordance with wire transfer instructions provided by the required recipient, Seller, Escrow Agent, or Closing Agent.

   c. This Agreement, together with the Schedules and other agreements referred to in this Agreement, constitute the entire agreement between the Parties pertaining to the subject matter of this Agreement and supersede all prior and contemporaneous agreements, understandings, negotiations and discussions, whether oral or written, of the Parties regarding such subject matter.

DocuSign Envelope ID: 55FCE3B8-C281-4578-8382-937C90D886F

d.  Regardless of whether the transactions contemplated by this Agreement are consummated, each Party shall pay its or their own costs and expenses, including Legal Costs and investment banking, accounting, consulting, and other professional fees, incurred in connection with the negotiation, preparation, investigation and performance by such Party of this Agreement and the transactions contemplated under this Agreement, except as otherwise provided for herein.

e.  This Agreement shall not be recorded by Buyer. Any attempt to record this Agreement or any memorandum hereof or any reference hereto by Buyer or any agent or representative of Buyer shall, at the sole option of Seller, constitute a material default by Buyer, in which event Escrow Agent shall deliver the Deposit to Seller and Buyer shall execute and deliver such documents, and take such other actions, as Seller may require in order to evidence of record that Buyer has no right, title, claim, or interest in the Property.

f.  Notwithstanding any other provision of this Agreement, any representation, warranty, or covenant of Seller contained in this Agreement that by its terms survives Closing or the termination of this Agreement, shall not survive the closing of the Bankruptcy Case.

g.  Seller and Buyer will, without additional consideration, sign, acknowledge, and deliver any other documents and take any other action necessary or appropriate and reasonably requested by the other to carry out the intent and purpose of this Agreement.

h.  Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that exceed federal and state guidelines have been found in buildings in Florida. Additional information regarding radon and radon testing may be obtained from county public health units.

i.  The determination that any covenant, agreement, condition or provision of this Agreement, which is not necessary to the enjoyment by either party of the benefit contemplated herein, is invalid and shall not affect the enforceability of the remaining covenants, agreements, conditions or provisions hereof and, in the event of any such determination, this Agreement shall be construed as if such invalid covenant, agreement, condition or provision were not included herein.

j.  No failure or delay of either Party in the exercise of any right given to such Party hereunder shall constitute a waiver thereof unless the time specified herein for exercise of such right has expired, nor shall any single or partial exercise of any right preclude any other or further exercise thereof or of any other right. The waiver of any breach hereunder shall not be deemed to be a waiver of any other or any subsequent breach hereof.

k.  Whenever provision is made in this Agreement for one Party to indemnify the other Party with respect to any claim or risk, such provision shall be interpreted to mean that the Party (in this Section "**Indemnitor**") indemnifying the other Party (in this Section "**Other**") agrees to indemnify, defend, and hold harmless the Other from and against any and all fines, penalties, losses, expenses, obligations, claims, suits, actions, damages, or liabilities, including reasonable attorneys' fees, which the Other may incur or to which it may become subject as a result of or in connection with, and to the extent caused by, the described claim or risk.

l.   The Parties neither intend to confer any benefit hereunder on any Person other than the parties hereto, nor shall any such third party have any rights hereunder.

m.   This Agreement shall be governed by, construed, interpreted and the rights of the Parties determined in accordance with the laws of the State of Florida without reference to its choice or conflicts of laws principles. Each Party: (i) irrevocably submits to the jurisdiction of the Bankruptcy Court; (ii) waives any objection to laying venue in any such action or proceeding in the Bankruptcy Court; (iii) waives any objection that the Bankruptcy Court is an inconvenient forum or does not have jurisdiction over any Party; and (iv) agrees that service of process upon such Party in any such action or proceeding shall be effective if given in accordance with the notice provisions of this Agreement.

n.   BUYER AND SELLER HEREBY EACH WAIVE THE RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING BASED UPON, OR RELATED TO, THE SUBJECT MATTER OF THIS AGREEMENT.

o.   Buyer acknowledges receipt of the Bid Procedures Order, and represents that it has either had its counsel review and advise Buyer regarding the terms of the Bid Procedures Order, or that Buyer has had the opportunity to have counsel review the Bid Procedures Order. Buyer agrees to be bound by the terms and conditions of the Bid Procedures Order and the Bid Procedures approved thereby.  Any omission from this Agreement of any condition, obligation, or requirement contained in the Bid Procedures Order shall not relieve Buyer of such condition, obligation, or requirement.  Buyer acknowledges that it is entering into this Agreement, and upon the Closing shall take the Hotel, subject to the terms, conditions, and requirements of the Bid Procedures Order, and the Sale Order.

26.   Exhibits.  The following Exhibits referenced elsewhere in this Agreement are attached hereto and incorporated herein by reference:

a.   **Exhibit "A" -** Description or Depiction of the real property.

[The Parties have signed on the following page.]

**[Signature page to Purchase and Sale Agreement]**

| | |
|---|---|
| **BUYER:** | **SELLER:** |
| 7800 UNIVERSAL BLVD OWNER LLC, a Delaware Limited Liability Company | UNIVERSAL TOWERS CONSTRUCTION, INC., a Florida corporation |

Signature: _____

Print name: Jennifer Nellany

Title: Executive Vice President and Secretary

Signature: _____

Print name: Lis Oliveira-Sommerville

Title:  President

Date:

_____,
2021

Date:

_____,
2021

44994225 v3

**EXHIBIT A**

**LEGAL DESCRIPTION**

Property Described in the land records of Orange County, Florida as:

Lot 2, FLORIDA CENTER, UNIT 16, according to the plat thereof as recorded in Plat Book 5, Pages 141 through 145, Public Records of Orange County, Florida.

44994225 v3